STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. TONY TACHIN ET AL., PLAINTIFFS IN ERROR.

Argued June 19, 1919—Decided November 17, 1919.

On error to the Supreme Court, whose opinion is reported in 92 *N. J. L.* 269.

For the defendant in error, *Pierre P. Garven.*

For the plaintiffs in error, *Otto A. Stiefel.*

Per Curiam.

The judgment under review herein should be affirmed, for the reasons expressed in the opinion delivered by Mr. Justice Swayze in the Supreme Court.

Minturn, J. (dissenting). The unconstitutional character of the legislation *sub judice* is properly before us, both on the motion to acquit and the exception to the charge. In any event, the question is jurisdictional and may be considered here. *State* v. *Shupe,* 88 *N. J. L.* 610.

The statute (*Pamph. L.* 1918, *p.* 130) under which these defendants were jointly indicted and convicted, is a *replica*

of a statute passed by the congress of the United States over a year prior to the act *sub judice,* and in that fact inheres the constitutional infirmity of the state legislation.

The rule is settled that the legislation of congress upon a subject within the limitation of the constitution, supersedes all state legislation, and by necessary implication prohibits it. *Prigg* v. *Pennsylvania,* 16 *Pet.* 539; *Gibbons* v. *Ogden,* 9 *Wheat.* 1.

It is not the mere existence of the power of congress to legislate where the power is not exclusive, but the fact that congress has exercised the power, which makes the exercise of the same power by the state incompatible with the exercise of the federal power; and the power of the state to enact similar legislation is thereby suspended until the repeal of the federal act. *Sturges* v. *Crowninshield,* 4 *Wheat.* 122; *Davis* v. *Beason,* 133 *U. S.* 333.

In *Houston* v. *Moore,* 5 *Wheat.* 1, Mr. Justice Washington declared at a formative period of our constitutional law: "The states cannot legislate upon a subject concerning which congress has already legislated under constitutional authority." And in *Texas* v. *White,* 7 *Wall.* 700, it was declared that the preservation of the states and the maintenance of their governments are as much within the design and care of the constitution of the United States, as the preservation of the Union, and the maintenance of the national government. Were the rule otherwise, it is manifest that a citizen could be twice indicted and tried for the same offence in the federal and state jurisdictions, respectively, contrary to the constitutional inhibition, which provides that he shall not be twice put in jeopardy for the same offence. *Const. Amends., art.* 5.

The rule is unquestionable that each government, state and federal, is supreme within its own sphere, and, therefore, a conviction or acquittal in the state jurisdiction could not be pleaded in bar to a similar indictment in the federal jurisdiction. *Dodge* v. *Woolsey,* 18 *How.* 331; *Abelman* v. *Booth,* 21 *Id.* 506; *United States* v. *Tarble,* 13 *Wall.* 397.

The cases cited in the Supreme Court, as a basis for sustaining this enactment, upon examination will be found not

to conflict with this principle, and it will be observed that they apply solely to situations where the state legislated in the absence of congressional legislation; or where by the federal act the right of the state to legislate concurrently was expressly conceded. Thus, in the earliest case cited (*Fox* v. *Ohio*, 5 *How*. 410) the federal legislation conceded to the states concurrent jurisdiction over counterfeiting.

In *State* v. *Marigold*, 9 *How*. 560, state legislation was not involved, and the court dealt only with an act of congress. In *Ex parte Siebold*, 100 *U. S.* 371, the question was as to the enforcement of federal election laws by state officials by which legislation the latter were created by congress *pro hac vice* federal officers in the elections concerning members of congress.

The same question was presented in *Ex parte Clarke*. 100 *U. S*. 399. In *In re Loney*, 134 *Id*. 372, the power of the federal courts to punish for perjury, a person who falsely swore to his right to vote, before a state notary, in a congressional election, was presented, and it was again held that *pro hac vice* the notary was performing a federal function.

In *Sexton* v. *California*, 189 *U. S.* 319, the Extortion act passed by congress to prevent frauds in the internal revenue, expressly conceded to the states the power to pass similar legislation, thus impliedly denying the right to the states in the absence of such concession.

In *Halter* v. *Nebraska*, 205 *U. S.* 34, no federal question involving state jurisdiction was involved. The only inquiry was as to the constitutionality under the fourteenth amendment, in the absence of congressional legislation, of an act of Nebraska, prohibiting the use of the United States flag for advertising purposes in certain lines of trade and not in others.

None of these cases, it will be observed, militates against the fundamental constitutional rule, which was evolved when the settled construction of the constitution was in the making, and which by repeated adjudications has been emphasized since that day, notably so in the recent employment liability cases, involving the right of the state to legislate upon that

subject, in the absence of federal legislation dealing with interstate commerce.

Such was the status in the recent case of *New York Central R. R. Co.* v. *Winfield,* '244 *U. S.* 147, in which it is said: "When congress acts upon the subject all state laws covering the same field are necessarily superseded by reason of the supremacy of the national authority."

The second and third sections of the act *sub judice* are subject to further condemnation. They characterize as illegal not only an appeal to subvert the government by force, but also any attempt "by speech, writing, printing or in any other way whatsoever to incite or abet, promote or encourage hostility or opposition to the government of the United States or of the State of New Jersey."

The third section of the act provides that "any person who shall become a member of any organization, society or order organized or formed, or attend any meeting or counsel or solicit others so to do, for the purpose of inciting, abetting, promoting or encouraging hostility or opposition to the government of the United States or of the State of New Jersey, or who in any manner shall aid, abet or encourage any such organization, society, order or meeting in the propagation or advocacy of such a purpose shall be guilty of a high misdemeanor."

These provisions, prohibitive of the right of free speech, freedom of the press, and of free assembly, are in direct conflict with the guarantees of free speech and free assembly contained in the federal and state constitutions. The first amendment to the federal constitution provides that "congress shall make no law abridging the freedom of speech or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

The state constitution, article 1, section 5, provides that "every person may fully speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." The principle of free speech and freedom to assemble constitutes the corner stone of

American liberty, and when the right to exercise those fundamentals without the advocacy of force, is quiescently suppressed, "the lamp which guides our destiny" (to quote the trial court) will be as effectually extinguished as the lamp that shone at the shrine of Isis.

"The right of the people," says the United States Supreme Court, "peaceably to assemble for the purpose of petitioning congress for a redress of grievances, or for anything else connected with the powers or the duties of the national government, existed long before the adoption of the federal constitution." *United States* v. *Cruikshank,* 92 *U. S.* 542; *Prosser* v. *Illinois,* 116 *Id.* 252.

Change of the fundamental law by constitutional and legal methods is not condemned either by the constitution or the public policy of the nation or states. *George* v. *Braddock,* 45 *N. J. Eq.* 757.

The right to effect a change or alteration of the organic law by lawful methods, is the basic doctrine of popular rights, contained in the Declaration of Independence; and in pursuance of that declared policy, party organizations have been created since the inception of our system of government, and, as a result of that basic declaration, no less than eighteen amendments have been added to the federal constitution, many of them presenting radical changes in methods and structure of our government, as originally conceived and ordained.

This fundamental conception of party government, involving alteration and change by the recognized and prescribed constitutional methods, is set at naught, and substantially subverted by the legislation under consideration.

The sole prototype of this legislation in American constitutional history, is found in the Alien and Sedition acts of the Adams' administration, under the obloquy of which the federal party went into extinction and oblivion. Speaking of those enactments, the biographer of John Adams reflects the verdict of history, when he says: "No one has ever been able heartily or successfully to defend these foolish enactments of ill-considered legislation, which have to be abandoned by

tacit general consent to condemnation." *Morse's Life of John Adams, p.* 283.

If legislation of this character is to pass unchallenged by courts of justice, whose officers are sworn to uphold the constitution as the very bedrock of our legal system, the time is not inopportune for a revision of the fundamental law, comporting with the excision of the guarantee contained in the Bill of Rights and Magna Charta, which have been the cherished legacy of British and American law since the epochal day at Runnymede.

Nor is it perceivable how party government, which is essentially one of criticism for the avowed purpose of "promoting opposition to the government," can at all subsist in such an atmosphere of constructive illegality. The presence of such legislation upon the statute book is not only subversive of personal liberty to speak, write and publish one's sentiments upon government policies, and in criticism of the acts of state and national agencies; rights which were upheld in the seventeenth century, in the King's Bench, in England, by Lord Erskine, in the famous trials of Hardy and Lord George Gordon, but its legal recognition is equally subversive of constitutional and party government, and must inevitably supersede it, by the substitution of a Napoleonic bureaucracy, in which the inevitable *coup d'état* awaits only the advent of the man on horseback.

Nor is its evil tendency limited to the continuance of the hectic exigency which engendered it, upon the theory of the civil law that, *Inter armes leges silent,* a doctrine which in the absence of a legitimate proclamation of martial law, has no place in constitutional government, but it extends its corroding insidious influence into the public mind and conscience, which to-day complaisantly applies its provisions to these unsophisticated Russians at the bar, and to-morrow adopting the precedent thus set, drags from the tribune a Patrick Henry, a John Brown or a Wendell Phillips to emphasize the absolute destruction of a constitutional ideal.

If one of these defendants be legally chargeable with an appeal to armed force (for there is no testimony of the kind

against Tachin), the ordinary statute law of New Jersey and the United States, superadded to the common law, present ample provision for his prosecution, but to a conviction based upon this extraordinary unconstitutional legislation, I cannot extend my concurrence or approval.

I am requested by Mr. Justice Kalisch to state that he concurs in these views.

Kalisch, J. (dissenting).  The plaintiffs in error were convicted in the Hudson County Court of Quarter Sessions on an indictment which charged them jointly that they "did willfully, knowingly and unlawfully attempt by speech to incite, abet, promote and encourage hostility and opposition to the government of the United States, in that in the presence of divers good people then and there assembled, did publish, utter, pronounce, declare and say with a loud voice to the persons there assembled, in substance, that the present war in which the government of the United States is now engaged with Germany, was a war for the benefit of the capitalists of the world only; that the president of the United States, at the behest of the capitalists, was sending our men to France to be slaughtered; that we, the people of the United States, did not need any government, and that the persons here should arm themselves for protection against the government, contrary to the form of the statute," &c.

The judgment pronounced on the conviction was brought to the Supreme Court for review on a strict writ of error and bills of exceptions, and that tribunal affirmed the judgment. The record being brought before us for final review, the majority of the court affirmed the judgment of the Supreme Court on the opinion given by the latter tribunal. I am constrained to dissent from the result reached in this court, and will state briefly the reasons for my disagreement as the important subjects to be discussed will permit.

The statute of 1918, which is the sole basis for the indictment, *inter alia*, provides: "Any person who shall advocate, in public or private, by speech, writing, printing, or by any other means, the subversion or destruction by force of the

government of the United States, or the State of New Jersey, or attempt by speech, writing, printing, or in any other way whatsoever to incite or abet, promote or encourage hostility or opposition to the government of the United States, or of the State of New Jersey, shall be guilty of a high misdemeanor," &c.

I concur in the view of the learned judge who wrote the opinion of the Supreme Court that "hostility or opposition to the government of the United States or of the State of New Jersey means such hostility or opposition as involves the subversion or destruction by force of those governments."

As the indictment alleges that the utterances of the plaintiff in error were made in public, it relieves me from commenting upon the constitutionality of that part of the statute which relates to private writings or utterances except to observe that the legislation in this respect is a revival of a species of legislation born of the zeal of the times of James I., and condemned in no uncertain terms by Mr. Foster in his *"Crown Law"* (ed. 1762), 198–208.

The statute is aimed at seditions, utterings or writings which may lead to an attempt at treason—that is, to subvert or destroy government by force, such as levying war against it, &c. This is the apparent sense of the construction given to the act by the Supreme Court and adopted by this court, which construction appears to me to be only logical deduction flowing from the language of the act, though the act appears to be of doubtful validity, in view of article 1 of the constitution of this state, which declares: "Treason against the state shall consist only in levying war against it, or in adhering to its enemies, giving them aid and comfort. No person shall be convicted of treason, unless on the testimony of two witnesses to the same overt act, or on confession in open court;" and in view of paragraph 5 of article 1 of the constitution which declares, *inter alia:* "No law shall be passed to restrain or abridge the liberty of speech or of the press." This command immediately follows the constitutional declaration that "every person may freely speak, write and publish his senti-

ments on all subjects, being responsible for the abuse of that right."

It is clearly observable that one of the constitutional mandates deals with the constitutional right of the individual, whereas the other relates to the legislative power to enact any law which shall restrain or abridge the liberty of speech or of the press.

The constitution having defined the crime of treason the legislature was without power to widen the scope of the definition by including seditious acts which do not fairly come within the fact of levying war against the United States or state, or adhering to its enemies, giving them aid or comfort.

It is of great significance that treason is the only crime defined in our constitution. Independently of the fact that it is a crime of a political nature, most strongly affecting the stability of government, the reason for the unique status given to the crime in the constitution very likely had its origin in the fear that free and open discussions involving criticism of the government, or of those entrusted to administer it, might be hampered by drastic legislation in the interest of some political creed or other in power.

The legislature, it is true, has not styled the act as one directed against treason, but nomenclature cannot change its intrinsic character. The act in the respect pointed out is of doubtful validity. It is proper to advert here to a canon of statutory construction universally recognized that penal laws must be construed strictly. It follows, therefore, unless the matter charged against the plaintiffs in error come clearly within the inhibition of the statute, the conviction must fail. Or, if there is doubt on the subject, a similar result must ensue.

A fair reading of the matter set out in the indictment as constituting the offence committed by the plaintiffs in error, makes it manifest that it does not come within the statute or within the construction given to the statute by the Supreme Court. It can hardly be said that the alleged utterances of the plaintiffs in error advocated a subversion or destruction by force of the government of this state or the United States.

Giving to the language used its broadest significance, it constituted seditious slander against those entrusted with the administration of the government of the United States. This situation led the learned judge to state in the opinion adopted by a majority of this court: "The charge of the indictment was that the defendants uttered, in substance, certain English words therein set forth. On the motion to quash the averment was necessarily assumed to be true. At the trial the proof was that the words were uttered in Russian. We do not doubt that the indictment ought to have averred at the least that the words were uttered in Russian. We are, however, precluded from considering this argument because it was not made in the trial court; no exception raises the question specifically, and there is no assignment of error."

The learned judge errs in stating that on the motion to quash the averment in the indictment was necessarily assumed to be true. That is the legal rule applicable to a demurrer to an indictment but not to a motion to quash.

The record shows that on the motion to quash it was objected that the indictment did not set out the words spoken, but merely their substance, and that an exception was taken to the court's refusal to quash. Under our decisions no error can be assigned upon the refusal to quash the indictment. By statute, a motion to quash must be made before the jury is sworn. And this appears by the cases dealing with the question to be a necessary preliminary to enable a defendant to assign error upon the record for the defect in the indictment. The indictment was clearly bad, in that it did not set out the words alleged to have been spoken. *Webster* v. *Holmes,* 62 *N. J. L.* 55, 57; *Dr. Sachaverell's Case,* 15 *St. Tr.* 1.

It is said that there is no assignment of error based upon the insufficiency of the indictment. It is true that there is no specific assignment. The record, however, discloses a general assignment which states, in substance, that the court erred in giving judgment against the defendant, whereas judgment should have been given in their favor. Under this assignment the defendants were entitled to challenge the legal sufficiency of the indictment, which is an essential part of the

record, by virtue of the fact that a motion to quash was made in the trial court before the jury was sworn and denied. *Mead* v. *State,* 53 *N. J. L.* 601.

Where the error is one of law and not of fact and appears upon the face of the record a general assignment is sufficient. 2 *Tidd Pr.* 1226.

In *State* v. *Flynn,* 76 *N. J. L.* 473, a case in which it appears no motion was even made to quash the indictment, as required by the statute, and the legal insufficiency of the indictment was first raised after judgment, Chancellor Pitney, speaking for this court (at *p.* 177), said: "The difficulty with the indictment in the present case is of such a character that we think it is not cured by verdict and judgment, for the judgment finds the defendant guilty only of that with which he is charged in the indictment; and that does no more than to accuse him of one or the other of several matters, one of which is no offence against the law."

And so, here, the indictment under which the defendants were convicted stated no offence against the law. It is a well-settled rule of law that an action for slander will not lie jointly against two, and the reason for the rule, as stated by Mr. Justice Van Syckel, in *Van Horn* v. *Van Horn,* 56 *N. J. L.* 318, in speaking for this court (at *p.* 325), is, "because the words of one are not the words of another." It is to be observed that the indictment charges the seditious slanderous words to have been uttered and published by the defendants. The uttering of the words is in its nature the individual act of each defendant. If he utters seditious slanderous words with intent to incite "forcible hostility and opposition to the government of the United States," he incurs individual responsibility for his unlawful act. No joint criminal responsibility can be predicated upon such individual utterances. A different legal rule obtains where the seditious words are in writing, for one or more may be engaged in the composition of the seditious libel, and the publication thereof becomes the joint act of those engaged therein. It is not intended to intimate that a joint indictment would not lie against two or more persons who conspire and combine

together to utter seditious words with the evil intent above referred to. This may be accomplished by an indictment for conspiracy.

The opinion of the Supreme Court further proceeds upon the theory that the indictment was sufficient without an allegation of criminal intent, and that there need be no proof of such intent, because the statute does not make criminal intent necessary. The case cited in support of this assertion does not seem to me to pronounce any such drastic doctrine. The legal rule universally recognized by the common law and in this country is, that where the offence is one involving moral turpitude, which includes malice, it is essential that the criminal intent should be alleged and proved on the trial.

It will not be inappropriate to refer here to what the learned Mr. Foster said in his incomparable discourse on high treason and kindred offences, in the year 1762, a period in which sedition laws were in their flower. Section 7 (on *p.* 200) reads: "As to mere words supposed to be treasonable, they differ widely from writings in point of real malignity and proper evidence. They are often the effect of mere heat of blood, which, in some natures otherwise well disposed, carrieth the man beyond the bounds of decency or prudence. They are always liable to great misconstruction from the ignorance or inattention of the hearers, and too often from a motive truly criminal. And therefore I chose to adhere to the rule which hath been laid down on more occasions than one since the revolution, that loose words not relative to any *act* or *design,* are not overt acts of treason." And, (at *pp.* 201, 202) the learned author, continuing the thought, says: "And yet in case of bare words, positions of this dangerous tendency, though maintained maliciously, advisedly and directly, and even in the solemnities of preaching and teaching, are not considered overt acts of treason. In no case can a man be argued into the penalties of the acts by inferences and conclusions drawn from what he hath affirmed. The criminal position must be directly maintained, to bring him within the compass of these acts."

"Nor will every rash, hasty, or unguarded expression, owing perhaps, to natural warmth, or thrown out in the heat of disputation, render any person criminal within these acts; the criminal doctrine must be maintained maliciously and advisedly."

The word "maliciously," in its legal sense, denotes an evil state of mind.

The opinion of the Supreme Court suggests that "an attempt to incite hostility and opposition (forceable hostility and opposition, as we construe it) to the government of the United States, is sedition, and nothing would be added by charging an intent to create such hostility and opposition," and that the "indictment does charge that the defendants acted willfully, knowingly and unlawfully." This view appears to be in conflict with the weight of authority and cannot be sustained on logical grounds.

A criminal attempt is a step taken toward the commission of a crime, with intent to commit the crime. Unless there is a criminal intent accompanying the attempt, there can be no criminal attempt. Bishop, in his valuable work on *Statutory Crimes,* paragraph 391, after discussing the subject of an attempt to publish a libel, concludes as follows: "On principle we see that we must set out the act which was committed, and the specific intent which accompanied it." The same learned author, in paragraph 71 of volume 2 on *Criminal Procedure,* says: "Now, an attempt to commit a crime is a compound composed of two elements—first, the intent to commit it, and secondly, an act prompted by the intent, yet falling short of the doing." Paragraph 88, and the paragraphs following, present the settled law on this subject, as above expressed.

The words "willfully, knowingly and unlawfully" in the indictment are not equivalent to an allegation of intent to commit that which the statute denounces as a crime. For a man may do an act forbidden by the statute innocently, but, nevertheless, the act would be unlawful. He may do it willfully and knowingly—that is, he may perform a conscious act and yet be guiltless of any criminal intent. The essence

of the offence is the intent with which the words were spoken, and in order to subject an individual to prosecution for a violation of the statute, the indictment must charge that the words were spoken to accomplish the object interdicted by the statute. This the indictment fails to do.

. The indictment charged no crime, and therefore no valid judgment could be pronounced upon the conviction of these defendants, and the fatal defects in the indictment appearing on the face of the record a general assignment of error was sufficient to raise the validity of the judgment.

As to the defendant Tony Tachin there was a motion made in his behalf, at the conclusion of the entire case, for a direction of a verdict upon the ground that there was no evidence of words spoken by him, which motion was denied, and an exception was duly taken, upon which error was assigned. In dealing with this phase of the case, I repeat here again what the Supreme Court said: "That the indictment charged that the defendants uttered, in substance, certain English words therein set forth. At the trial the proof was that the words were uttered in Russian. It is said that this was a fatal variance. We do not doubt that the indictment ought to have averred at the least that the words were uttered in Russian. We are, however, precluded from considering this argument because it was not made in the trial court; no exception raises the question specifically, and there is no assignment of error."

As I read the record, counsel for the defendant Tachin asked the trial court to direct a verdict of acquittal in behalf of his client because there was no evidence against him of words spoken by him. There was proof that Fedodoff, the other defendant, spoke in Russian, and there was no proof that the defendant spoke the words in the indictment either in Russian or English. The claim, therefore, made in the trial court that there was no evidence of words spoken by the defendant was based upon actual fact. As there was no proof that the words laid in the indictment were spoken by Tachin it was immaterial, so far as Tachin was concerned, whether they were spoken by Fedodoff in Russian or in Eng-

lish.   Now, the assignment of error appears to be based specifically upon the refusal of the trial court to direct a verdict of acquittal.

The refusal of the trial court to direct a verdict for Tachin was error.   The record plainly shows that the question whether the state had made out a case against him under the indictment and evidence was fairly presented to the trial judge, and, in my judgment, this defendant was entitled to such direction.   It seems to me, therefore, that the Supreme Court should have considered and decided the question presented, especially as it appeared that the evidence did not support the averment of the indictment in a most essential particular.

It is not disputed that in order to convict the defendants under the indictment and the evidence, it was necessary that the jury should find that the words uttered or the acts done were spoken and done with intent to forceably incite hostility and opposition to the government of the United States.

The trial judge, after repeating the language alleged to have been used by one of the defendants, and emphasizing it with oratorical effect, said:   "You may consider that language as being language which tended to incite, abet, promote and encourage hostility and opposition to the government of the United States."   Now, it is apparent that the vital question for the jury to determine in order to arrive at a proper conclusion as to the guilt or innocence of the defendants, was not only whether the defendant Fedodoff spoke the language charged in the indictment, but whether such language was uttered with intent to incite forceable hostility and opposition to the government of the United States.

The jury were practically instructed that it could find the defendants guilty as charged in the indictment if it found that Fedodoff uttered the language and that Tachin hired the hall for the meeting and was present throughout the speech and had declared "that they got the hall and were going to speak."   It is manifest that this instruction improperly took away from the consideration of the jury the right to pass upon the sense in which the language was

500     COURT OF ERRORS AND APPEALS.

Stephens v. Comm'rs Palisades Inter. Park.     93 N. J. L.

used by Fedodoff and the intent with which he uttered it. There was no testimony in the case which would permit any reasonable inference that Tachin was aware that Fedodoff would utter the language alleged in the indictment. For the various reasons stated the judgment should be reversed.

*For affirmance*—THE CHANCELLOR, PARKER, BERGEN, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, ACKERSON, JJ.   9.

*For reversal*—MINTURN, KALISCH, JJ.   2.