114 N.J. Super. 181 (1971)
275 A.2d 461
STATE OF NEW JERSEY, PLAINTIFF,
v.
MARC JAHR, DEFENDANT.
Superior Court of New Jersey, Law Division  (Criminal).
Argued March 5, 1971.
Decided March 16, 1971.
*183 Mr. Joseph D.J. Gourley, Passaic County Prosecutor argued the motion for the State.
Mr. Edward Carl Broege argued the motion for the Defendant.
JOELSON, J.S.C.
Defendant, who has been indicted for violation of N.J.S.A. 2A:148-16, moves to have the indictment dismissed on the ground that the statute is invalid.
N.J.S.A. 2A:148-16 provides:
Any person who utters, sells, gives away, circulates, distributes or exhibits to the view of another, or possesses with intent to utter, sell, give away, circulate, distribute or exhibit to the view of another:
a. Any book, speech, article, circular or pamphlet, made or produced in any manner or by any means set out and made legible, in any language, which in any way, in any part thereof, incites, counsels, promotes, advocates, or encourages the subversion or destruction by force of the government of the United States or of this state; or

*184 b. Any constitution, by-laws, rules or record of the proceedings of any organization, association, society, order, club or meeting of 3 or more persons, made or produced in any manner or by any means set out and made legible, in any language, which in any way, in any part thereof, incites, counsels, promotes, advocates or encourages the subversion or destruction by force of the government of the United States or of this state; or
c. Any picture, photograph, emblem, representation, sign or token, made or produced in any manner or by any means set out and made legible, which in any way incites, counsels, promotes, advocates, encourages or symbolizes the subversion or destruction by force of the government of the United States or of this state 
Is guilty of a high misdemeanor.
The first count of the indictment charged that
defendant did possess with intent to utter, give away, circulate and distribute to divers persons there assembled, the names of whom are unknown, a certain circular or pamphlet entitled `Rising Up in Anger', dated Summer, 1970, certain parts of which, incite, counsel, promote, advocate and encourage, subversion and destruction by force of the government of the United States and of this State, contrary to the provisions of N.J.S. 2A:148-16.
The second count charges that at the same time and place specified in the first count, he
did possess with intent to utter, give away, circulate and distribute to divers persons there assembled, the names of whom are unknown, a certain pamphlet or circular entitled, `Rising Up in Anger', dated Summer, 1970, wherein, by means set out and made legible, were set out certain pictures, photographs, representations, signs and tokens which incite, counsel, promote, advocate, encourage and symbolize the subversion and destruction by force of the government of the United States and of this State, contrary to the provisions of N.J.S. 2A:148-16.
The third count charges that at said time and place, he
did utter, give away, circulate and distribute to divers persons there assembled, the names of whom are unknown, a certain circular or pamphlet entitled `Rising Up in Anger', dated Summer, 1970, cirtain parts of which incite, counsel, promote, advocate and encourage subversion and destruction by force of the government of the United States and of this State, contrary to the provisions of N.J.S. 2A:148-16.
*185 In addition to asserting that the statute in question is unconstitutional, defendant has argued that prosecution under it is barred by the preemption doctrine of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956). That case clearly held that when the Congress enacted the so-called Smith Act, 18 U.S.C.A. § 2385, it preempted the field as to sedition legislation. However, in Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1958), the United States Supreme Court appears to veer away from the broad holding of Pennsylvania v. Nelson without expressly overrruling it.
Thus, in Uphaus v. Wyman the Court interpreted Pennsylvania v. Nelson as holding that a state could proceed with prosecutions for sedition "against the State itself." Furthermore, Uphaus seized upon some language in Pennsylvania v. Nelson to stress the fact that federal preemption by reason of the Smith Act applies only to a state act "which proscribed the same conduct."
The statute now under consideration includes references to the subversion or destruction by force of the government of the United States and "this State," and the indictment similarly refers to "this State" as well as the government of the United States. Moreover, although the general thrust of the Smith Act and N.J.S.A. 2A:148-16 might be generally considered to have elements in common, the conduct proscribed is considerably different.
Without attempting a detailed analysis of the variations in the two laws, it can be pointed out that whereas Smith Act, subd. 2(a)(2), 18 U.S.C.A. § 2385, specifically requires an "intent to cause the overthrow or destruction of any such government" on the part of the circulator or distributor of specified written or printed matter, N.J.S.A. 2A:148-16 is silent as to the requirement of such intent. The federal statute does not deal with pictures, photographs, emblems, representations, signs or tokens, but the New Jersey statute does. The federal law mentions "overthrow or destruction" only, but the State statute deals also with "subversion." *186 Lastly, the federal law does not deal with possession of literature, but the state law does forbid possession under certain circumstances.
If Pennsylvania v. Nelson had not been diluted by Uphaus v. Wyman, this court would consider that the preemption doctrine barred the enforcement by state authorities of N.J.S.A. 2A:148-16 dealing with the same general subject matter. However, in view of the doubt presently existing, this court will address itself to the question of the validity of N.J.S.A. 2A:148-16, and it is the opinion of the court that the statute must be declared invalid.
Before engaging in an analysis of the constitutional questions involved, it should be emphasized that we are dealing here with a statute which makes it a crime to distribute or exhibit certain material, and not with a statute which makes unlawful the advocating of the subversion or violent destruction of the government of the United States or this State, or which makes unlawful the attempt to incite such subversion or destruction. There is a statute of the State of New Jersey, N.J.S.A. 2A:148-13, which addresses itself to such activity, but the State has not brought in an indictment thereunder. Since N.J.S.A. 2A:148-13 is not invoked in the indictment, this Court will not undertake to determine the constitutionality of that statute. However, it has been unheld as constitutional in State v. Tachin, 92 N.J.L. 269 (Sup. Ct. 1919), aff'd 93 N.J.L. 485 (E. & A. 1919). There seems to be no doubt that, if properly framed, a law may make unlawful the advocacy of violent overthrow of government. Dennis v. United States, 341 U.S. 494, 95 L.Ed. 1137, 71 S.Ct. 857 (1951). As has been said by the United States Supreme Court: "While the Constitution protects against invasions of individual rights, it is not a suicide pact." Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). However, although the people of a democracy cannot abuse freedom of speech and press, neither can their government abuse its right to regulate *187 those freedoms. It is the opinion of this court that in N.J.S.A. 2A:148-16 the government has done so.
A careful reading of that statute reveals that its initial clause is over-broad, and that the ensuing subsections are vague. Its over-breadth is such that it apparently forbids conduct which cannot constitutionally be forbidden under the First and Fourteenth Amendments of the United States Constitution, and its vagueness is such that it also leaves to conjecture all the things which are prohibited.
As to the over-broad aspects of the statute, the court refers to the fact that it does not require any intent or even any knowledge as to contents on the part of the person who utters, sells, gives away, circulates, distributes or exhibits proscribed material to the view of another. The court will deal herein with the possibility that the requirement of an intent can be inferred or supplied, but it is clear that the only mention of intent in the statute itself is with reference to possession "with intent to utter, sell, give away, circulate, distribute or exhibit to the view of another." Thus, absent any requirement of "intent to cause the overthrow of any such government," as is found in the Smith Act, subsection 2(a)(2), 18 U.S.C.A. § 2385 dealing with the distribution or circulation of prohibited material, and absent any requirement of knowledge as is found in 2(a)(3), the New Jersey law is a blunderbuss. It would, regardless of knowledge or intent, make a felon of the librarian who distributes a revolutionary essay and of the newsdealer who distributes an edition of the New York Times carrying the wild words of an exponent of the New Left.
As to the possibility of the court inferring or implying the necessity of an intent, it is true that in Dennis v. United States, supra, the United States Supreme Court held that with regard to Smith Act, subsec. 2(a)(3), 18 U.S.C.A. § 2385, "the structure and purpose of the statute demand the inclusion of intent as an element of the crime." However, that section makes it unlawful "to organize or help to organize any society, group, or assembly of persons who teach, advocate, *188 or encourage the overthrow or destruction of any government in the United States by force or violence; or to be or become a member of, or affiliate with, any such society, group, or assembly of persons, knowing the purposes thereof." Thus, since that section of the federal law deals with organizing a group or becoming a member of that group with knowledge of its purposes, the Supreme Court said: "Certainly those who recruit and combine for the purpose of advocating overthrow intend to bring about that overthrow. We hold that the statute requires as an essential element of the crime proof of the intent of those who are charged with its violation to overthrow the Government by force and violence." This is a far cry from the type of statute presently under consideration.
As to the element of intent, it is also significant that nowhere in N.J.S.A. 2A:148-16 or in the immediately preceding statutes which were enacted along with it (N.J.S.A. 2A:148-13 through 15) is there any requirement that action must be knowing or wilful. This is by way of contrast with Smith Act, subsec. 2(a)(1), 18 U.S.C.A. § 2385, which contains the words "knowingly or wilfully," and subsec. 2(a)(2), which contains the words "with intent to cause the overthrow or destruction of any such government." As to the essentiality of requiring the words "wilful," "wilfully" or their equivalents in a criminal statute, see Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1944).
The best answer to any suggestion that the court should supply the requirement of wilfullness or intent is to be found in the language used in Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) in which the court warns against "judicially rewriting" a statute. The court then stated:
"To put the matter another way, this Court will not consider the abstract question of whether Congress might have enacted a valid statute but instead must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects."
*189 Furthermore, there is good reason to believe that in drawing N.J.S.A. 2A:148-16 in 1920, the New Jersey Legislature deliberately failed to require the element of intent. In order to develop this point, it will be necessary to refer to the fact that as early as 1902, the Legislature enacted a series of laws aimed at anarchists or persons who advocate the subversion or destruction by force "of any and all government." These laws are to be found as N.J.S.A. 2A:148-7 through 10. Subsequently, in 1918 and again in 1920, the Legislature addressed itself to the advocacy of the subversion or destruction by force "of the government of the United States or of this State." These 1918 and 1920 statutes are either closely parallel to or identical with the anarchy statutes of 1902, except in one vitally important aspect, which will be dealt with shortly.
Thus, N.J.S.A. 2A:148-7, dealing with advocating anarchy, is almost word-for-word identical with N.J.S.A. 2A:148-13, which was passed sixteen years later and dealt with advocating subversion or destruction of the government of the United States or this State. Likewise, N.J.S.A. 2A:148-8, dealing with becoming a member of an anarchistic society, is substantially the same as N.J.S.A. 2A:148-14, which covers the same field as to becoming a member of a society advocating subversion or overthrow of the government of the United States or of this State. However, when we come to the subject of the circulation of printed matter, the difference is great between the earlier enactment covering anarchy and the later covering subversion or destruction of the government of the United States or of this State. Not only does the later statute, N.J.S.A. 2A:148-16, add the words "in any way" when proscribing printed matter or representations advocating the subversion or violent overthrow of government, but it also deletes the requirement of intent which was an integral part of N.J.S.A. 2A:148-9, its counterpart as to literature advocating the overthrow of any and all government.
*190 N.J.S.A. 2A:148-9, enacted in 1902, forbade circulation or distribution "with intent to incite, promote, or encourage hostility or opposition to, or the subversion or destruction of any and all government." (Italics supplied). N.J.S.A. 2A:148-16, enacted in 1920, is significantly silent as to the need for intent. Can this be mere oversight? The court thinks not in view of the fact that the other provisions of the later statutes so closely repeat those of the earlier. This conclusion is bolstered by the fact that in 1919, when enacting N.J.S.A. 2A:148-20 which made it a crime to display certain flags, ensigns or signs, the Legislature once more specifically provided that it must be done "for the purpose of inciting, promoting or encouraging hostility or opposition to or subversion or destruction of any and all government."
It has often been held that the Legislature is presumed to be aware of its own enactments, and that subsequent laws are made with knowledge of previous ones. Wilson v. Robert A. Stretch, Inc., 44 N.J. Super. 52 (Ch. Div. 1957); Eckert v. N.J. State Highway Department, 1 N.J. 474 (1949); Goldberg & Co. v. Division of Employment Security, 21 N.J. 107 (1956). In United States v. C.I.O., 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) the court said: "Remedial laws are to be interpreted in the light of previous experience and prior enactments."
Yet, even if this court were to attempt to resuscitate N.J.S.A. 2A:148-16 by attempting to read into it the requirement of wilfullness or intent, the enactment must nevertheless succumb to the ailment of vagueness as to many of its provisions. For in subsections (a), (b) and (c) it fairly founders in a sea of ambiguity.
As to vagueness, first let us deal with subsec. (c) of N.J.S.A. 2A:148-16, which makes it a crime to distribute or exhibit or to possess with intent to do so "any picture, photograph, emblem, representation, sign or token * * * which in any way incites, counsels, promotes, advocates, encourages or symbolizes the subversion or destruction by force of the government of the United States or of this State." It *191 should be noted that the indictment specifically charges defendant with violation of this subsection. When the court asked the prosecutor at the oral argument of this motion what photograph or representation was the basis for the indictment under subsection (c), he failed or respectfully declined to specify, evidently on the theory that the motion then being argued was addressed to the statute generally rather than the indictment specifically. The court, however, is at a loss to determine just what is covered by subsection (c). Is it a swastika, a hammer and sickle, a clenched fist, a picture of Fidel Castro? Or is it, perhaps, a Confederate flag?
Furthermore, some difficulty is presented by the use of the word "subversion" in N.J.S.A. 2A:148-16. This word is not contained in the Smith Act, 18 U.S.C.A. § 2385, which deals only with "the overthrowing or destroying of any government in the United States by force or violence." Since N.J.S.A. 2A:148:16 refers to "the subversion or destruction by force of the government," it is unclear whether the element of force is contemplated by the New Jersey law. Recourse to the dictionary casts strong doubt as to whether force or violence is an element of subversion. Webster's New International Dictionary (2d ed., unbridged, 1951).
Nor can the court overlook the phrase "in any way" that is repeated in each of the subsections in the context of "which in any way, in any part thereof, incites, counsels, promotes, advocates or encourages the subversion or destruction by force of the government of this State." This is a most unfortunate phrase in a criminal statute where precision is a requisite, and even more unfortunate in a statute dealing with freedom of speech and press. What does it mean? Can it refer to a leaflet or printed speech bitterly castigating rat-infested slums? Might not this in some way promote or encourage subversion of government in the mind of the reader? Certainly, this is a strained *192 interpretation, but the mere fact that it can be considered highlights the inadequacy of the statute.
For it is well settled that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). See also, Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed. 2d 469 (1966). Moreover, as already mentioned, the requirements of precision are all the more severe in dealing with legislation inhibiting free speech and free press. In N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), we find the following:
The objectionable quality of vagueness and over-breadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application. * * * These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. * * *
* * * If there is an internal tension between proscription and protection in the statute, we cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights. Broad prophylactic rules in the area of free expression are suspect. * * * Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.
Likewise, in Keyishian v. Board of Regents of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), we find this language:
When one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful *193 zone. * * *" Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. * * * The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed.
See also, State v. Klapprott, 127 N.J.L. 395 (Sup. Ct. 1941) in which the court struck down a New Jersey statute for vagueness, saying that "the Criminal Code must be definite and informative so that there may be no doubt in the mind of the citizenry that the interdicted act or conduct is illicit."
Similarly, when dealing with cases involving attempts to limit or regulate speech or press, the courts have ruled that the usual presumption in favor of the validity of a statute is replaced by a contrary presumption. Listing a long line of cases to that effect, the court stated in Bantam Books v. Sullivan, 372 U.S. 58, 71, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963): "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."
In arguing the constitutionality of the statute in question, the State has leaned heavily on Gitlow v. N.Y., 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1923). Although this court is of the opinion that the Gitlow case is only tangentially on point, if at all, the court finds Gitlow no longer to be the prevailing law. In that case, which upheld a New York law dealing with criminal anarchy, there was a dissent by Justices Holmes and Brandeis which stressed the "clear and present danger" doctrine. Then, in Whitney v. California, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927), the court upheld a California statute dealing with criminal syndicalism. In doing so, it relied heavily on Gitlow, supra.
However, in 1951, Dennis v. United States, supra, stated: "Although no case subsequent to Whitney and Gitlow has expressly over-ruled the majority opinions in those cases, there is little doubt that subsequent opinions have inclined towards the Holmes-Brandeis rationale."
*194 Finally, in 1969 our highest court expressly over-ruled Whitney, supra, which had been grounded upon Gitlow, supra. In Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the court overturned the Ohio criminal syndicalism statute. Referring to the Whitney case involving a similar California act, the court said that in Whitney it had previously held that "without more, `advocating' violent means to effect political and economic change involves such danger to the security of the State that the State may outlaw it." It then went on to formalize a deeply significant change in direction by saying:
But Whitney has been thoroughly discredited by later decisions. See Dennis v. United States. * * * These later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. * * *

* * * * * * * *
Accordingly, we are here confronted with a statute which, by its own words and as applied, purports to punish mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate the described type of action. Such a statute falls within the condemnation of the First and Fourteenth Amendments. The contrary teaching of Whitney v. California, supra, cannot be supported, and that decision is therefore overruled.
The State, of course, is far from powerless in dealing with persons who riot or incite to riot. The very first law in our criminal statute books is N.J.S.A. 2A:85-1, which makes "affrays, riots, routs and unlawful assemblies" a crime. Furthermore, we have N.J.S.A. 2A:85-14, which provides that "any person who aids, abets, counsels, commands, induces or procures another to commit a crime is guilty as a principal." Although that statute deals with crimes actually committed or attempted, we have also N.J.S.A. 2A:98-1, which constitutes the conspiracy to commit a crime to be a crime in and of itself. Then, too, on the federal level we have the Smith Act, 18 U.S.C.A. *195 § 2385, referred to hereinabove, and also 18 U.S.C.A. § 2101, which makes it a crime to travel interstate or use interstate facilities such as a telephone for the incitement of a riot.
In summary, it is the opinion of this court that the statute under consideration is so broad and ambiguous in failing to inform the public specifically as to what type of written or printed material is forbidden, that caution would dictate a far-reaching restraint in the exercise of free circulation of controversial material. The danger in such a law is evident. The grim history of our tortured century should teach us that a free nation cannot be destroyed by a book, but that a nation where the safest course of action is book burning is no longer entirely a free nation.
There is a certain irony in the fact that those who look avidly towards the fall of our government are not hesitant to seek the protection of its courts. In so doing, they afford the opportunity for the shallowness of their views to be demonstrated. For a government which extends the safeguards of its Constitution to all its people  even to those who despise that government  exposes the poverty of thought and the bankruptcy of intellect of its detractors. Thus, does it make the best and most effective answer to them. A good government of a democracy which enjoys and deserves the confidence of its people need not resort to the panic of unconstitutional legislation because of the shrill invective of those who lack the wisdom or stamina to strive for responsible improvement and change.
In view of all the foregoing, it is the opinion of the court that N.J.S.A. 2A:148-16 is invalid, and that the indictment based thereon must therefore be dismissed.