STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
AUGUST KLAPPROTT ET AL., PLAINTIFFS IN ERROR.

Submitted May 6, 1941—Decided December 5, 1941.

Before BROGAN, CHIEF JUSTICE, and Justices CASE and
HEHER.

For the defendant in error, *Charles T. Downing,* Prosecutor of Pleas of the County of Sussex.

For the plaintiffs in error, *Wilbur V. Keegan* (*Anthony J. Armore*, of counsel).

For the American Civil Liberties Union, as *amicus curiæ*, *James A. Major* and *Frank H. Pierce* (of the New Jersey bar), *Arthur Garfield Hays* and *John F. Finerty* (of the New York bar).

BROGAN, CHIEF JUSTICE. These writs of error present for review four judgments of conviction, three based on indictments charging violation of statute *R. S.* 2:157B-5, which reads:

"Any person who shall, in the presence of two or more persons, in any language, make or utter any speech, statement or declaration, which in any way incites, counsels, promotes, or advocates hatred, abuse, violence or hostility against any group or groups of persons residing or being in this state by reason of race, color, religion or manner of worship, shall be guilty of a misdemeanor."

The fourth is based on an indictment which charges violation of *R. S.* 2:157B-6, which reads:

"Any owner, lessee, manager, agent or other person who shall knowingly let or hire out, or permit the use of any building, structure, auditorium, hall or room, or any part thereof, whether licensed or not, to or for the use of any organization, association, society, order, club, group or meeting of three or more persons where it is purposed or intended to hold any meeting or assembly of three or more persons whereat any provision or provisions of sections 2:157B-2 to 2:157B-5 of this title are to be violated, shall be guilty of a misdemeanor; and any person or persons who shall knowingly hire any such building, structure, auditorium, hall, or room, or any part thereof, for the purpose of using or permitting the same to be used by others for the purpose of violating any provision or provisions of said sections 2:157B-2 to 2:157B-5, shall be guilty of a misdemeanor."

The first, third and fourth indictments charge Klapprott, Kohler and Clark, the plaintiffs in error, with violation of the statute first quoted in that in June, 1940, each of them

made a speech at Andover, Sussex County, New Jersey, "inciting, counselling, promoting and advocating hatred, abuse, violence and hostility against a group of persons residing in this state by reason of race, religion and manner of worship * * *."

It would serve no purpose to reproduce and publish in this opinion the statements made by each plaintiff in error. It is sufficient to say that the individuals made statements containing unworthy and scurrilous references to the Jewish people.

The second indictment charged that Klapprott, and others, as trustees and agents of the German-American Bund Auxiliary, &c., did knowingly "permit the use of a structure for a meeting of three or more persons where it was purposed and intended to hold a meeting of three or more persons, whereat persons, in the presence of two or more persons, were to make speeches inciting, counselling, promoting and advocating hatred, abuse, violence and hostility against a group of persons residing in this state, by reason of race, religion and manner of worship, * * *," &c.

Pleas of not guilty, first entered by the defendants, were withdrawn and a demurrer to each indictment filed. The trial court, after consideration, overruled the demurrers, found the defendants guilty and sentenced them to fine and imprisonment.

There are many grounds for reversal argued. The first and second points are directed to the joint or second indictment which is attacked on the ground that it does not charge the defendants "with the commission of any crime," and that the acts alleged in the indictment do not constitute a violation of the statute. The third, fourth and fifth points challenge the statute under which the individual indictments were found as unconstitutional. The argument is that the statute (*R. S.* 2:157B-5) is in conflict with sections 1, 2, 5 and 18 of the first article of the Constitution of the State of New Jersey. Generally speaking, these sections comprehend the freedom of the individual, in the matter of speech and assembly.

The sixth point is that the statute itself is void on its face because it curtails, regulates and inhibits that freedom of

speech secured to all persons by the Fourteenth Amendment of our Federal Constitution; and, finally, that the statute is vague, uncertain, arbitrary, capricious and violative of the due process clause of the Fourteenth Federal Amendment and therefore unconstitutional.

We think that the appeals before us should be considered on the fundamental question raised, that is, whether the statute as such deprives the plaintiffs in error of liberty of speech, in violation of the rights guaranteed them by our own constitution in article 1, section 5, and the due process clause of the Fourteenth Amendment of the Federal Constitution. In this inquiry the substance of the statute, with regard to its purpose, must be considered. The section of the New Jersey Constitution relied upon in this phase of the matter reads as follows:

"Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. * * *." (Article 1, section 5.)

The pertinent part of the Fourteenth Amendment of the Federal Constitution reads as follows:

"* * * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The restrictions imposed on the Federal law-making body are continued in the first amendment to the United States Constitution which reads:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

Thus it is that the Fourteenth Amendment to the Federal Constitution restrains the Legislatures of the several states from enacting laws that the Congress, by the first amendment,

is itself incompetent to make, *e. g.*, laws respecting an establishment of religion * * * or abridging the freedom of speech or of the press * * *.

The demurrer to the indictments is general in character and the legal effect of it is that each averment that is well pleaded shall be taken as confessed, leaving the question of legal sufficiency to the court. But conclusions of law arising from the stated facts are not admitted. *Coxe* v. *Gulick*, 10 *N. J. L.* 328; *Tinsman* v. *Bel. Del. R. R.*, 26 *Id.* 148; *Davis* v. *Minch*, 80 *Id.* 214; *Koewing* v. *West Orange*, 89 *Id.* 539. Our inquiry then will be directed to the validity of the statutes (2:157B-5 and 2:157B-6) upon which the indictments are founded. While every effort should be made to uphold a statute and every presumption indulged in favor of its validity, nonetheless a statute, penal in character and in derogation of the common law, must be judged according to its weakness rather than its strength. The statute (2:157B-5) subjects the individual to indictment and criminal prosecution for his spoken word. It is not a case of libel, *i. e.*, a *written* publication defamatory of a private person or definite class of living persons. Considering the utterances as slanders, it should be remembered that at the common law, words spoken, however defamatory, were not the subject of indictment unless they directly tended to a breach of the peace or were seditious or blasphemous or obscene or constituted an incitement to the commission of an indictable offense. (*Cf. Russell on Crime* (*9th ed.*) 694.) The instant statute therefore runs contrary to the course of the common law and must be strictly construed.

In deciding this case the learned trial judge had this to say:

"The New Jersey statute under consideration is new legislation in a broad field of law and does not appear to have been the subject of consideration and decision by our appellate courts * * *. In case the *defendants should prevail on these demurrers, the defendants would be dismissed and discharged from the premises and it is doubtful that the state would be entitled to a bill of exceptions or to a review by writ of error of an error in law*." (Italics supplied.)

"That a state, in the exercise of its police power, may punish those who abuse freedom of speech by utterances inimical to the public welfare, tending to corrupt public morale, incite to crime, or disturb the public peace, is not open to question.

"In all courts, and certainly in courts of the first instance, the legislative declaration of purpose and policy is entitled to the gravest consideration and unless clearly overthrown by facts of record must prevail.

"It does not appear that the statute in question is so clearly in contravention of our constitutional law that there can be no reasonable doubt about it. For the reasons stated the demurrers are overruled."

The trial court, in the observations that preceded the conclusion above quoted, discussed on broad lines the constitutionality of statutes enacted under what purports to be police power. It is more or less a common practice for courts of first instance to leave constitutional questions for the consideration of an appellate tribunal and the trial judge in this case, as is indicated above, took that course. Perhaps his conclusion would have been otherwise were it not for the "legislative declaration of purpose and policy" which he mentioned in his memorandum. Counsel for the state, in defense of the convictions, argued that the "preamble" of the statute (*R. S.* 157B-1), under the title "purposes of Chapter," defines the legislative policy. Therein are the recitals (a) that freedom of conscience in the matter of religious worship is assured to the people of this state under the Federal Constitution, and (b) that civil and religious liberty are guaranteed to the people of the state under our State Constitution, and (c) that "the dissemination, circulation or publication of propaganda or statements creating or tending to create hatred, violence or hostility against people of this state by reason of their race, color, religion or manner of worship, has created or tends to create violations of said constitutional assurances and guarantees, and disturbance of domestic tranquility and peace of the people of this state, and is provocative of violence causing injury to persons and property." Thus it is that under the fundamental law of the state and nation freedom

in the matter of religious worship is assured, but under those same fundamental charters freedom of communicating opinion and information and speech generally are also assured. The question is whether subdivision "c" of this preamble is at war with or limits unduly the guarantees of freedom of assemblage and of speech and freedom to communicate information and opinions to others. No one will contend that a legislative fiat could limit or restrict constitutional guarantees. Statutes that regulate speech or the press that have been upheld as not in conflict with our fundamental law are those directed at abuses which menace the state itself, *e. g.*, utterances inimical to public welfare, tending to corrupt public morals, incite to crime, disturb the public peace, &c. *Gitlow* v. *New York,* 268 *U. S.* 51, and cases cited therein are examples. Outside of these no case is cited upholding a statute providing punishment for having made statements or speeches. Compare *De Jonge* v. *Oregon,* 299 *Id.* 353; *Cantwell* v. *Connecticut,* 310 *Id.* 296, and cases cited therein. The characterization of the propaganda inhibited by the statute under consideration, in this instance the spoken word, could scarcely be more general or indefinite.

That the statute first mentioned, *supra,* tends to limit that which a speaker may say with impunity is obvious. Freedom of speech and of the press are not absolute rights; their abuse is subject to punishment by the state (*Whitney* v. *California,* 274 *U. S.* 357; *Stomberg* v. *California,* 283 *Id.* 359; New Jersey Constitution, article 1, section 5) ; and yet it would be a greater evil to our state and its people if the press was subject to censorship and the free speech of the individual dependent upon a censor's *imprimatur.* It is obvious that previous restraint of free speech or free press abridges the guaranteed liberties. And that is the sound reason why freedom of the press and freedom of speech are so zealously defended by courts and people alike even in the case of those who seem to desecrate that right. The abuse of these rights, however, need not go unpunished. There still remain the provisions of our laws regarding libel and slander.

It is our view that the statute, *supra,* by punitive sanction, tends to restrict what one may say lest by one's utterances

there be incited or advocated hatred, hostility or violence against a group "by reason of race, color, religion or manner of worship." But additionally and looking now to strict statutory construction, is the statute definite, clear and precise so as to be free from the constitutional infirmity of the vague and indefinite? That the terms "hatred," "abuse," "hostility," are abstract and indefinite admits of no contradiction. When do they arise? Is it to be left to a jury to conclude beyond reasonable doubt when the emotion of hatred or hostility is aroused in the mind of the listener as a result of what a speaker has said? Nothing in our criminal law can be invoked to justify so wide a discretion. The criminal code must be definite and informative so that there may be no doubt in the mind of the citizenry that the interdicted act or conduct is illicit. The element of "violence," mentioned in the statute, is universally understood to connote the unlawful exercise of force, i. e., a breach of the peace, but in the indictments before us neither breach of the peace nor resulting violence are alleged. Unbridled license in the matter of speech has no absolute immunity either in the federal courts or the courts of the states generally. (Cf. Gitlow v. New York, supra); but in the matter of free speech the utterances subject to punishment must be of the class that bring injury to society as such or are intended so to do. The cases cited above make this abundantly clear.

In construing a statute strictly regard must be had for all its parts as well as its rigid enforcement. To particularize: Is the making of a statement in the presence of two or more persons in any language, which incites, let us say, "hostility" towards a group by reason of religion or race, capable of being made into a misdemeanor? (The statute is in the disjunctive and speaks of "hatred, abuse, violence or hostility.") Suppose such statement was made in the privacy of one's home to two persons there present, or, as it is suggested in the excellent brief of the amicus curiæ, suppose a father is instructing his children about the religion of a neighbor and such exposition excites hostility in the children towards those neighbors. This exposition or statement of view would result in the commission of a misdemeanor under the scope of this

most sweeping statute. It is not required that the statement be made in a public place. Teachers in our high schools and colleges could be found to be violators of the law out of their lectures on the philosophy of history, or their dissertations on religion, or on the various cults which came into being through the years. Such consequences we do not think were intended by the legislature—yet utterances of this nature, if misconstrued or imperfectly understood by the listener, would *prima facie* make out a statutory offense.

The statements made by Klapprott and the others at their meeting place are not welcome to the ear of any good citizen. But our inquiry is whether they incited, counseled, promoted or advocated hatred, abuse, violence or hostility. These, as said above, are abstractions. Is it possible to say when ill will becomes hatred or when unworthy, scurrilous or false statements become abuse? As well try to point to a spot within a triangle which is equidistant from every point in the area enclosed as say when hatred takes the place of some lesser emotion. Then these passions or emotions "hatred," "hostility," &c., as well as being abstract, are relative in the individual. There is no norm to judge whether or when such emotion or passion comes into being. It may be entirely subjective in a given case. We do not think such phases of human reaction or emotion can be made a legitimate standard for a penal statute. To denounce one's fellows or advocate hostility to them, or to a group, because their origin began in a north country or a south country or because of creed or color is as revolting to any fair-minded man as it is absurd and unjust to the mind of a thoughtful man; but nevertheless to make the speaker amenable to the criminal law for his utterances they must be such as to create a "clear and present danger that will bring about the substantive evils" to society (*Schenck* v. *United States,* 249 *U. S.* 47) that the state has the right to prevent. The utterances must be such as constitute a danger to the state. We cannot say that the statements made by plaintiffs in error were of this character.

This case is, we think, controlled by *Near* v. *Minnesota,* 283 *U. S.* 697, and *Cantwell* v. *Connecticut, supra.* In the later case the appellant, a member of a sect known as

Jehovah's Witnesses, on a public street in New Haven, played a phonograph record which attacked in very offensive language the religion of which most of the listeners were members. In that case a statute of the State of Connecticut, under which appellant was convicted, was challenged on the ground it violated the Fourteenth Amendment of the Constitution of the United States. The statute in question prohibited soliciting of money for religious purposes without a permit first obtained. The appellant obtained no permit and went about the matter of selling his tracts and playing his phonograph records without one. Our Federal Supreme Court reversed the judgment of the appellate courts of Connecticut in which appellant's conviction was sustained and, among other things, said:

"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to villification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

"The essential characteristic of these liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed. Nowhere is this shield more necessary than in our own country for a people composed of many races and of many creeds. There are limits to the exercise of these liberties. The danger in these times from the coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all. These and other transgressions of those limits the states appropriately may punish.

"Although the contents of the record not unnaturally aroused animosity, we think that, in the absence of a statute

narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the state, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question."

This language is singularly appropriate in the case before us and the principles enunciated are controlling on this fundamental question.

It follows therefore that the statute, 2:157B-5, is in collision with the provisions of section 5, article I of our New Jersey Constitution and is likewise in conflict with the guarantees of the Fourteenth amendment of our Federal Constitution in the matter of freedom of speech. The statute is also void for uncertainty in that it is vague and indefinite, as we have pointed out above. The judgments of conviction in the case of Klapprott, Kohler and Clark are reversed.

The joint indictment upon which the individuals therein named were convicted, for permitting the use of a "structure" for a meeting of three or more persons, where such speeches were to be made, must also be reversed. If that which was said at the meeting was immune from regulation under our fundamental law, it necessarily follows that it was not unlawful to lease a hall or structure for the purpose of saying it. The demurrers to the several indictments should have been sustained.

The judgments are accordingly reversed.