George GOTTSCHALK, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. 2916.

Supreme Court of Alaska.

Feb. 10, 1978.

Sue Ellen Tatter, Kay, Christie, Fuld & Saville, Anchorage, for appellant.

Glen C. Anderson, Asst. Dist. Atty. and Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

MATTHEWS, Justice.

George Gottschalk was convicted of criminal libel and received a six-month jail sentence with four months suspended and a $500 fine. We shall briefly relate the circumstances on which the conviction was based.

On the evening of July 26, 1975 in Naknek trooper Phillip Gilson went to the Fisherman's Bar to investigate a disturbance. While there Gilson and Gottschalk had a disagreeable exchange of words. Later that evening trooper Gilson impounded Gottschalk's truck for being towed without operating lights or current registration. The next day Gottschalk was allowed to reclaim his truck and, in Gilson's presence and in the presence of three witnesses, accused Gilson of having taken $250 from the glove compartment. Trooper Gilson asked his superiors to investigate the charge. In response to this request, Gottschalk was interviewed several days later by investigator Norman Chafin. Chafin took two signed statements from Gottschalk, both on the same day. The first, related that there was $250.00 in the glove compartment of the truck when it was impounded and that it was missing the next day. It did not expressly accuse Gilson of taking the mon-

ey. The second statement, taken some five hours later related in part:

I figured the trooper was harassing me unduly and the $250 was never in the truck.

A two count indictment was returned against Gottschalk. In the first count he was accused of attempting to obtain $250 from Gilson by false pretenses. The jury acquitted him of this charge. In the second count he was accused of wilfully writing and publishing defamatory and scandalous matter concerning Gilson, with intent to injure or defame, in violation of AS 11.15.-310.[1] Although the statute makes criminal spoken defamatory words as well as written ones, the indictment charged Gottschalk only with writing and publishing. The trial court interpreted this to exclude the oral accusation which Gottschalk had made and the question for the jury was whether the first signed statement taken by investigator Chafin was criminally defamatory.

■ Gottschalk argues that Alaska's criminal defamation statutes are unconstitutionally vague. He also contends that they are unconstitutionally overbroad, that is, that they prohibit speech which is protected by the First Amendment to the United States Constitution as well as speech which may be unprotected.[2]

■ In *Stock v. State*, 526 P.2d 3 (Alaska 1974) we discussed the void for vagueness doctrine. The basic element of that doctrine is a requirement of fair notice. Criminal laws must give the ordinary citizen fair notice of what is and what is not prohibited. People should not be made to guess whether a certain course of conduct is criminal. Where because of its imprecision a vague statute may restrict the exercise of rights guaranteed by the First Amendment it is said to be overbroad. As we pointed out in *Stock*, that is one category of overbreadth. Another category has nothing to do with the clarity of statutory language. A statute may be adequately precise and still interfere with protected First Amendment rights. It too would be overbroad. 526 P.2d at 7 n. 7.

We decide in this case that Alaska's criminal defamation statutes are unconstitutionally vague, and therefore overbroad. As an alternative holding we decide that the statutes are overbroad even when considered apart from questions of uncertainty as to what conduct is criminal. We do not, of course, approve of defendant's statements; they are prohibited by AS 11.30.215 which make it a misdemeanor to give a false report of a crime to a peace officer. Before explaining our reasons a brief explanation of the nature and purpose of criminal defamation laws is appropriate.

1. AS 11.15.310 provides:
   *Libel and Slander.* A person who willfully speaks, writes, or in any other manner publishes defamatory or scandalous matter concerning another with intent to injure or defame him is guilty of a misdemeanor, and upon conviction is punishable by imprisonment in a jail for not less than six months nor more than one year, or by a fine of not less than $50 nor more than $500, or by both. This section applies to an allusion to person or family, with intent to injure, defame or maliciously annoy the family.
   AS 11.15.310 must be read in conjunction with AS 11.15.320 and AS 11.15.330 set out below:
   AS 11.15.320: *Truth as defense.* In prosecutions under § 310 of this chapter, the truth of the defamatory or scandalous matter is a defense only when uttered or published with a good motive and for a justifiable end.
   AS 11.15.330: *Presumption of malice in prosecution for libel and slander.* An injurious

publication is presumed malicious if no justifiable end or good motive is shown for making it.

2. Gottschalk has standing to raise these points even if his speech was unprotected. This broadened rule of standing applies because of the importance of the principle of free speech in our democracy. We discussed this rule in *Marks v. City of Anchorage*, 500 P.2d 644 (Alaska 1972) in the following language:
   In other words, to protect first amendment freedoms, the Court has allowed "vicarious" assaults on invalid statutes; a defendant need not show that his conduct was itself entitled to protection as a prerequisite to successfully attack an overbroad or vague statute. *See generally*, Note, The First Amendment Overbreadth Doctrine, 83 Harvard L.Rev. 844 (1970).
   500 P.2d at 656 n. 7.

## HISTORY AND DEVELOPMENT OF CRIMINAL DEFAMATION LAWS

The history and development of the law of criminal defamation has been the topic of several excellent law journal articles,[3] and has been discussed by the United States Supreme Court in *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), and *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). These histories indicate that in England prior to the American revolution criminal defamation had two purposes: (1) to prevent public unrest caused by critical statements concerning those in power; and, (2) to preserve public order by providing criminal sanctions for insults to private persons, thus tending to prevent dueling or other violent responses. Lord Coke explained these concerns in reporting *De Libellis Famosis*:

> Every libel is made either against a private man, or against a magistrate or public person. If it be against a private man it deserves a severe punishment, for although the libel be made against one, yet it incites all those of the same family, kindred or society to revenge, and so tends *per consequens* to quarrels and breach of the peace, and may be the cause of the shedding of blood and great inconvenience; if it be against a magistrate, or other public person, it is a greater offense; for it concerns not only the breach of the peace, but also the scandal of Government; for what greater scandal of Government can there be than to have corrupt and wicked magistrates to be appointed and constituted by the King to govern his subjects under him?

77 Eng.Rep. 250–251 (1609). Any statement which tended to degrade or disgrace another, to hold him up to public hatred, contempt or ridicule, or cause him to be shunned or avoided, was regarded as defamatory. Defamatory statements of opinion, as well as statements of fact, were considered unlawful. Intention to injure or defame was not an element of the offense.[4] Truth was not a defense. In fact, if the defamation was true it was thought to sting all the more and have an even greater tendency to incite violence than a falsehood.[5]

Remarkably, public as well as private aspects of criminal defamation initially survived the passage of the First Amendment to the United States Constitution. Thus, the Sedition Act of 1798 made unlawful writing, publishing or speaking anything "false, scandalous and malicious . . . against the government . . . or the President . . . with intent to defame . . . or to bring them . . . into contempt or disrepute . . ."[6] This unpopular act was not long in existence, but was never held unconstitutional. Further, it has not been orthodox constitutional doctrine that the First Amendment was intended to bar criminal defamation, although some of our most eminent judges have believed it was.[7] The primary substantive reform effected by the American states was to modify the rule that truth was no defense. Most states, by statutes similar to AS 11.15.320, made truth a defense so long as the otherwise defamatory statement was uttered with good motives

---

3. J. Kelly, Criminal Libel and Free Speech, 6 Kan.L.Rev. 295 (1958); Note, Constitutionality of the Law of Criminal Libel, 52 Colum.L.Rev. 521 (1952); R. Leflar, The Social Utility of the Criminal Law of Defamation, 34 Texas L.Rev. 984 (1956).

4. Indeed, even under the Oregon criminal libel statutes from which Alaska's laws were taken, the only intention required was an intention to publish. *State v. Mason*, 26 Or. 273, 38 P. 130 (Or.1894).

5. Thus, Lord Mansfield's famous maxim, "[t]he greater the truth the greater the libel." W. Prosser, Handbook of the Law of Torts § 116, at 797 (4th ed. 1971).

6. 1 Stat. 596 (1798).

7. *Abrams v. United States*, 250 U.S. 616, 624, 40 S.Ct. 17, 20, 63 L.Ed. 1173, 1178 (1919) (Holmes, J. and Brandeis, J., dissenting); *Garrison v. Louisiana*, 379 U.S. 64, 80, 85 S.Ct. 209, 218, 13 L.Ed.2d 125, 135 (1964) (Black, J. and Douglas, J., concurring); *Beauharnais v. Illinois*, 343 U.S. 250, 287, 72 S.Ct. 725, 746, 96 L.Ed. 919, 944 (1952) (Jackson, J., dissenting).

and for a justifiable end.[8] Apart from that modification, the common law of criminal defamation continued in force unchanged, but largely unused, until the *Garrison* decision.

The court in *Garrison* applied the rule of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) to Louisiana's criminal libel statutes. That rule extends constitutional protection to defamations concerning public figures which are either true or not intentionally or recklessly false. Since Louisiana's statute, like AS 11.15.320, limited truth as a defense to situations where publication was made with good motives and for justifiable ends, it was inconsistent with the *New York Times* rule and held unconstitutional on that basis. The *Garrison* decision would dictate an instant reversal in this case, except for the State's argument that we can and should narrow Alaska's criminal defamation statutes to save them from unconstitutionality. This contention is discussed in the portion of this opinion concerning overbreadth.

Before turning to the issue of vagueness, one final word should be said about the nature of the offense of criminal defamation. Although one of its reasons for being was to prevent statements having a tendency to excite a violent response, that tendency is not generally regarded as an element of the offense.[9] It has become clear that the real interest being protected by criminal defamation statutes is personal reputation. Whether that purpose justifies use of the criminal law has been questioned. Reflecting the sentiments of the draftsmen of the Model Penal Code, the court in *Garrison* wrote:

'It goes without saying that penal sanctions cannot be justified merely by the fact that defamation is evil or damaging to a person in ways that entitle him to maintain a civil suit. Usually we reserve the criminal law for harmful behavior which exceptionally disturbs the community's sense of security . . . It seems evident that personal calumny falls in neither of these classes in the USA, that it is therefore inappropriate for penal control, and that this probably accounts for the paucity of prosecutions and the near desuetude of private criminal libel legislation in this country . . .'. Model Penal Code, Tent.Draft # 13, 1961, § 250.7, Comments, at 44.

The Reporters therefore recommended only narrowly drawn statutes designed to reach words tending to cause a breach of the peace, such as the statute sustained in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, or designed to reach speech, such as group vilification, 'especially likely to lead to public disorders,' such as the statute sustained in *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919. Model Penal Code, supra, at 45. But Louisiana's rejection of the clear-and-present-danger standard as irrelevant to the application of its statute (citation omitted) coupled with the absence of any limitation of the statute itself to speech calculated to cause breaches of the peace, leads us to conclude that the Louisiana statute is not this sort of narrowly drawn statute.

379 U.S. at 69, 85 S.Ct. at 213, 13 L.Ed.2d at 130.

### VAGUENESS

■ What is defamatory or scandalous is not defined in AS 11.15.310; therefore, the common law definition must be relied on. At common law, any statement which would tend to disgrace or degrade another, to hold him up to public hatred, contempt or ridicule, or to cause him to be shunned or avoided was considered defamatory.[10] In our view this falls far short of the reasonable precision necessary to define criminal conduct.

8. *See, Garrison v. Louisiana, supra*, 379 U.S. at 80 note 7, 85 S.Ct. 218 n. 7, at 13 L.Ed.2d 135 n. 7.

9. R. Leflar, *supra* note 3, at 1013; Note, *supra* note 3, at 527.

10. *See*, 2 R. Anderson, Wharton's Criminal Law and Procedure § 883 (1957) and cases cited therein.

Whether an utterance is defamatory depends on the values of the listener. Even in an ethnically homogeneous culture these values will not be uniform, and it is not always easy to predict what will be taken as defamatory.[11] The confusion is compounded in Alaska, because among the several ethnic groups which reside here there may be divergent views on what is, and what is not, disreputable.

Important guidance is given us by *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). There a Georgia statute making it a crime to use opprobrious words and abusive language was struck down as unconstitutionally vague. The court noted that "opprobrious" was defined as "conveying or intended to convey disgrace" and "abusive" included "harsh, insulting language". The court noted that this language,

> effectively 'licenses the jury to create its own standard in each case.' Accordingly, we agree with the conclusion of the District Court, '[t]he fault of the statute is that it leaves wide open the standard of responsibility, so that it is easily susceptible to improper application.' (citations omitted)

*Supra* at 528, 92 S.Ct. at 1109, 31 L.Ed.2d at 417. The words used in AS 11.15.310, "de-

famatory" and "scandalous", are fair symptoms of "opprobrious." Each conveys a concept of disgrace. "Defamatory" and "scandalous" are certainly no less vague than "opprobrious".

*State v. Klapprott*, 127 N.J.L. 395, 22 A.2d 877 (N.J.1941) is also on point. There, the Supreme Court of New Jersey condemned as unconstitutionally vague a statute making it a crime to speak to two or more persons counseling, among other things, hatred, abuse or hostility against any racial, or religious group. The court stated:

> [O]ur inquiry is whether they incited, counseled, promoted or advocated hatred, abuse, violence or hostility. These, as said above, are abstractions. Is it possible to say when ill will becomes hatred or when unworthy, scurrilous or false statements become abuse? As well try to point to a spot within a triangle which is equidistant from every point in the area enclosed as say when hatred takes the place of some lesser emotion. Then these passions or emotions, "hatred," "hostility," etc. as well as being abstract, are relative in the individual. There is no norm to judge whether or when such emotion or passion comes into being. It may be entirely subjective in a given

---

11. Establishing a standard against which potentially defamatory statements may be measured generates considerable difficulty in a democratic society which prides itself on pluralism. Judge Learned Hand summarized the problem of noting that "a man may value his reputation even among those who do not embrace the prevailing moral standard." *Grant v. Readers Digest*, 151 F.2d 733, 734 (2nd Cir. 1945). American courts generally recognize that a person may suffer real damage by statements which tend to tarnish his reputation within a particular group or class even though the measuring group may be a small minority. Examples collected by Prosser include publication of a person's picture in connection with a whiskey advertisement, a statement that a person is about to be divorced, and the insinuation that a white man is a black man, that a businessman is a price cutter, or a Kosher meat dealer sells bacon. *See*, W. Prosser, Handbook on the Law of Torts § 111, at 743–44 (4th Ed. 1971). Taken to an extreme, this policy finds its limit in cases where the minority group is either insignificantly small or its values clearly anti-social.

An example would be a thief attempting to recover damages against a person who charged him with being an informer.

A parallel problem is that what is defamatory changes over time. One commentator illustrates this as follows:

> An interesting example . . . is the line of British cases in which the alleged defamation consisted in calling a man a "Papist." Such a charge was held not actionable when James I was on the throne, but a contrary result was reached during the rule of Charles II, and it was also libelous during the period between the abdication of James II and the accession of William and Mary, when to call a man a Papist would subject him to danger. (citations omitted)

1 Harper & James, The Law of Torts § 5.1, at 353 (1956). A more contemporary example might be labeling someone a "communist" or a "marxist", which within the past 50 years has been considered first defamatory, then non-defamatory, and next defamatory again, depending largely on United States foreign policy changes. W. Prosser, *supra* at 744 nn. 3, 4.

case. We do not think such phases of human reaction or emotion can be made a legitimate standard for a penal statute. 22 A.2d at 881. We also find persuasive the following dicta from the opinion of the Supreme Court of the United States in *Ashton v. Kentucky*, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966) in which Mr. Justice Douglas, speaking for the court, stated:

> We agree with the dissenters in the Court of Appeals who stated that: '. . . since the English common law of criminal libel is inconsistent with the constitutional provisions, and since no Kentucky case has redefined the crime in understandable terms, and since the law must be made on a case to case basis, the elements of the crime are so indefinite and uncertain that it should not be enforced as a penal offense in Kentucky.'

> .  .  .  .  .

> Here, as in the cases discussed above, we deal with First Amendment rights. Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer. We said in *Cantwell v. Connecticut, supra*, that such a law must be 'narrowly drawn to prevent the supposed evil,' 310 U.S. [296], at 307, 60 S.Ct. [900], at 905 [84 L.Ed. 1213, at 1220, 128 A.L.R. 1352], and that a conviction for an utterance 'based on a common law concept of the most general and undefined nature,' *id.*, at 308, 60 S.Ct. at 905 [84 L.Ed. at 1220, 128 A.L.R. 1352], could not stand. (footnotes omitted)

384 U.S. at 198, 86 S.Ct. at 1409, 16 L.Ed.2d at 472–73. Our conclusion is further supported by *Tollett v. United States*, 485 F.2d 1087 (8th Cir. 1973) in which a federal statute making it criminal to mail libelous or defamatory materials was held unconstitutional as being vague and overly broad.

One evil of a vague statute is that it creates the potential for arbitrary, uneven and selective enforcement. Nowhere is this more evident than in the area of criminal defamation, which is committed many times each day in the State of Alaska.[12] Yet this case is the first case since the organization of the Territory of Alaska in which a prosecution is reflected in the reported cases. This near disuse of the crime is reflected throughout the United States. Dean Leflar's comprehensive study of criminal defamation uncovered 110 reported criminal defamation cases between 1920 and 1955 of which 58 were reported in the ten year period 1920–29, 34 appeared in the twelve years from 1930 through 1941 and only 18 in the fourteen years from 1942 through 1955. Among these, he found:

> Nearly half the cases . . . can be classified as basically political . . . Commonest among the political cases were those in which prosecutions were filed against an unsuccessful political candidate or his supporters for statements made during a campaign, now ended, concerning his now successful opponent. Of the same sort were prosecutions of persons who, feeling aggrieved, made disagreeable statements about persons firmly entrenched in public office or power. One may suspect that in such cases the law was being used by the successful personage or his friends as a means of punishing their less potent enemies.

> Defamations are the stock-in-trade of loose talk, both oral and written, and few indeed are the loose talkers who go through a week without making a statement which if legally tested would satisfy the law's definition of defamatory crime. Carefully edited indeed is the issue of a newspaper, be it country weekly or city daily, that does not contain some item which on its face might be made the subject of a libel suit.

> R. Leflar, *supra* note 3 at 984.

---

12. Dean Leflar begins his analysis of the criminal defamation by noting:

> The crime of defamation as defined in the penal statutes and common law of the American states is one that is ostensibly committed in this country a thousand times and possibly ten or twenty thousand times daily. The definition of the crime in most states is broad enough to include most libels that are civilly actionable and a few others besides, and in some states slander is made a crime also.

R. Leflar, *supra* note 3 at 985–86. After studying the facts of these cases, Leflar concluded that criminal defamation prosecutions are brought primarily for the personal satisfaction of one close to the law enforcement apparatus who regards himself or an associate as having been defamed:

Modern criminal defamation prosecutions appear on analysis to serve pretty much the same function as the early prosecutions for libel of "great men." The usual pattern in the political cases, which are more numerous than any other type of case from 1920 on, is one of the "ins" prosecuting the "outs," of the winner prosecuting the loser. Even the nonpolitical cases have overtones of the same character. The successful prosecutions were, for the most part, for statements of a sort likely to have been unpopular at the time and place they were made.

Since jury sympathy with the position of complaining witnesses was almost a prerequisite to conviction, the appellate cases give little or no evidence that the criminal rule was used as a means of protecting politically powerless persons from defamations that might have appealed to mass prejudice. It was not much used as a sanction against irresponsible newspaper reports or editorials, though these have often been extremely damaging to libeled persons. In general

it was not used against persons or groups in positions of influence or power and practically could not have been; rather, it was used on behalf of such persons and groups against their detractors who were less fortunately situated. (footnotes omitted)

*Id.* at 1032.

Other commentators have reached the same conclusion.[13]

This pattern of selective enforcement is both the hallmark and the vice of a vague criminal statute. Because one must guess at what is forbidden, a vague statute's "standardless sweep allows policemen, prosecutors, and juries to pursue their personal predilections," *Smith v. Goguen*, 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605, 613 (1974), and thereby "encourages arbitrary and erratic arrests and convictions." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110, 115 (1972).

In holding AS 11.15.310–330 to be unconstitutionally vague we do not decide, however, whether all conceivable criminal libel statutes are necessarily vague. If the type of defamation sought to be prohibited receives a narrowly drawn statutory definition, especially one designed to reach words tending to cause a breach of the peace, then such a statute might well be proper.

13. The criminal libel cases of the present day indicate . . . that this almost obsolete action is being used by the authorities as a form of reprisal against those who criticize misconduct in office. (footnotes omitted)

Note, *supra* note 3, at 533.

In cases of ordinary crime, assault, robbery, etc., we expect immediate criminal action by the district attorney, and the civil action is generally unused. In libel cases, however, the civil action is much more important than the criminal, and the courts have never adequately worked out a distinction between the tort and the crime. A newspaper could take the risk of the tort action for many years and suddenly find itself, after libeling a friend of the police, subject to fine or imprisonment. The present atrophy of the crime would lend plausibility to cries of persecution and invasion of the liberty of the press, but a defense to such a prosecution alleging that the matter printed gave rise only to civil liability probably would not be accepted by the courts. (footnotes omitted)

J. Kelly, *supra* note 3, at 318–19.

If the law were to be properly executed, the prosecutor would constantly be investigating potentially libelous publications. Every civil libel suit would correspondingly be followed with a charge of criminal libel. Of course, as in any other area of the criminal law, the prosecutor has a great deal of discretion. This is the explanation for the paucity of criminal libel prosecutions. Assuredly there is an abundance of other more serious crimes which tend to disrupt society more than a libelous publication.

Furthermore, a criminal libel statute may degenerate to no more than a political weapon. It is rarely invoked and when it is, it may very well be for other than altruistic purposes.

Note, *Commonwealth v. Armao*: The End of Pennsylvania's Criminal Libel Law, 46 Temp. L.Q. 162, 167 (1972).

## OVERBREADTH

■ Even if our criminal defamation statutes were sufficiently precise to escape the defect of vagueness, they would still be overbroad. That is because truth is not an absolute defense under AS 11.15.320, but a conditional one; the accused must show not only that what he said was true, but that his intentions were good when he said it.[14] The First Amendment to the United States Constitution requires that truth be an absolute defense regardless of the motive of the utterer, at least where public officials [15] and public figures [16] or issues of general or public interest [17] are involved. Even false defamations are protected under such circumstances except those which are knowingly false or made with a high degree of awareness that they are probably false. The State disputes none of this, but argues that AS 11.15.310–330 may be narrowed to escape constitutional infirmity and that the trial court did so in its jury instructions. The narrowing process suggested by the State involves striking AS 11.15.320 in its entirety and reading expressly conflicting language into AS 11.15.310. We do not regard ourselves as free to construe AS 11.15.310 to mean something which, in light of AS 11.15.320, we know the legislature did not intend it to mean. As we stated in *State v. Campbell,* 536 P.2d 105, 111 (Alaska 1975), "at some point, it must be assumed that the legislature means what it says . . . ". We recognize the rule of construction that where it is reasonably possible to do so, statutes should be construed in a manner consistent with constitutional requirements. Here, however, as in *Campbell* and *Marks v. City of Anchorage, supra,* we are not able to save the statute in question because in doing so we would be stepping over the line of interpretation and engaging in legislation.[18]

We are supported in our conclusion that it would be improper for us to engage in the radical reconstruction necessary to save AS 11.15.310–330 from unconstitutionality by the decisions of other state courts which have dealt with the same problem. In *Commonwealth v. Armao,* 446 Pa. 325, 286 A.2d 626 (1972) the Pennsylvania Supreme Court struck down criminal libel statutes which suffered from the same defect as ours, stating:

> The Commonwealth urges us to in effect re-draft the criminal libel statutes in accordance with First Amendment requirements. To accede to this request would be to undertake a wholly inappropriate judicial activity amounting to judicial legislation.

286 A.2d at 632. To the same effect are *Weston v. State,* 528 S.W.2d 412 (Ark.1975) and *Eberle v. Municipal Court of Los Angeles Judicial District,* 53 Cal.App.3d 423, 127 Cal.Rptr. 594 (Cal.App.1976).

In light of our decision on the constitutional issues discussed we find it unnecessary to address any of the other issues raised in this appeal.

REVERSED.

14. AS 11.15.320 is set out in footnote 2.

15. *New York Times v. Sullivan, supra; Garrison v. Louisiana, supra* note 7.

16. *Curtis Publishing Co. v. Butz,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), *reh. denied* 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197.

17. *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971).

18. If we were to engage in the process of narrowing suggested by the State, after striking AS 11.15.320 we would then have to decide whether AS 11.15.310 should be limited only to cases of private defamation or should apply to defamation of public officials, public figures or concerning public issues; whether truth should be an absolute or a conditional defense to private defamation; and, whether a private false defamation which is neither knowingly nor recklessly false should be criminal. The variety of these choices underscores the essentially legislative nature of the task of bringing our defamation statutes within constitutional bounds.