James A. FITTS, Drew Wilder, and the South Carolina Press Association, Plaintiffs,

and

Charles L. Wyrick, Jr. and the American Civil Liberties Union of South Carolina, Inc., individually, and on behalf of others similarly situated, Intervenors–Plaintiffs,

v.

Wade S. KOLB, Jr., in his official capacity as Solicitor, and individually, Defendant.*

Civ. A. No. 3:90–2119–17.

United States District Court, D. South Carolina, Columbia Division.

Nov. 20, 1991.

* Editors Note: This opinion was originally published at 778 F.Supp. 1360. It is republished here to reflect the correct Judge's name.

Jay Bender, Baker, Barwick, Ravenel & Bender, Columbia, S.C., for plaintiffs.

William H. Davidson, III, Naufil and Ellis, Columbia, S.C., for defendant.

Edmund H. Robinson, Shimel, Ackerman, Theos, Spar & Robinson, Charleston, S.C., for intervenors-plaintiffs.

## MEMORANDUM OPINION AND ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

This is an action seeking a declaration that the South Carolina criminal libel statute[1] violates the First and Fourteenth

---

1. S.C.Code Ann. § 16–7–150 (Law.Co-op.1976).

Amendments to the United States Constitution. Plaintiffs challenge both the facial validity of the statute and its application to activities related to public expression in South Carolina. The case pits a state law, which has been in place since 1912, against the First Amendment to the United States Constitution, adopted by the states 200 years ago. The court concludes that the statute, as presently written, is unconstitutional.

## I

### PROCEDURAL HISTORY

This action was initiated by James F. Fitts, Drew Wilder, and the South Carolina Press Association (SCPA). Fitts and Wilder are working journalists in South Carolina. The SCPA is a voluntary association of some, but not all, newspapers in South Carolina. The defendant, Wade S. Kolb, is the Solicitor of the Third Judicial Circuit of South Carolina. The original complaint sought a declaration [2] that the criminal libel statute is unconstitutional only as it relates to the publication of newspapers in South Carolina.

Shortly after the action was instituted, Charles L. Wyrick, Jr. and the American Civil Liberties Union of South Carolina, Inc. (ACLU) sought leave to intervene. Wyrick is a newspaper publisher who is not a member of the SCPA, and the ACLU is an organization whose goal is the agressive advocacy of individual rights contained in the Bill of Rights. The court permitted the intervention and, upon motion of the intervenor-plaintiffs, certified two classes of plaintiffs. The first, designated the "speaker" class, consists of all those who speak, write, broadcast, publish, or otherwise communicate about public officials, public figures, or matters of public concern in South Carolina, and those who might wish to do so in the future. The second, designated the "reader" class, consists of all those who desire to hear, read, or receive such communications. The intervention of these new parties broadened the scope of the constitutional challenge to the criminal libel statute, so as to include all types of public expression in South Carolina.

At a status conference conducted shortly after the issues were joined in this case, both sides agreed that the salient facts in this controversy were essentially undisputed and that the case presented pure questions of law for the court. For this reason the parties agreed to, and did, enter into stipulations of fact. The court adopts these stipulations as its findings.[3]

## II

### FACTUAL BACKGROUND

In an article entitled, "My Vote Is Not For Sale," dated May 17, 1988, Fitts, the president of *The Voice*, a weekly newspaper in Kingstree, South Carolina, referred to two state legislators participating in upcoming elections as "black traitors" who participated in "corrupt dealings." The article further stated that "if every black in Williamsburg County would start stealing today and steal every day for the rest of their lives, they could not steal as much as those two have stolen during their time in power."

The two politicians to whom Fitts referred in the article, Senator Frank H. McGill and Representative B.J. Gordon, both subsequently filed charges alleging that Fitts published the statements in violation of the criminal libel statute. The arrest warrants alleged that Fitts "did, with malicious intent, originate, circulate, and publish a false statement ... intended to injure ... [their] character and reputation."

Following his arrest, Fitts was taken before a state magistrate who set bond at $40,000—eight times the maximum fine provided for in the statute. Fitts spent two nights in jail before being released on his own recognizance. The magistrate required, as a special condition of his release,

---

**2.** The declaratory judgment was sought pursuant to the provisions of the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988).

**3.** *See* Fed.R.Civ.P. 52.

that he not write any further derogatory articles about Senator McGill and Representative Gordon. Thereafter, the Williamsburg County grand jury entered an indictment charging Fitts with two violations of the criminal libel statute. Before his case came to trial, McGill and Gordon, who had both been re-elected in the interim, wrote to the Solicitor and requested that all charges be dropped. Gordon stated in his letter that "justice has prevailed by the grand jury's indictment." [4] The defendant, Kolb, then dismissed the indictment.

In a similar incident, Drew Wilder, a writer for *The Banner*, a newspaper in Orangeburg, South Carolina, published an article concerning a local high school principal, Hammond D. Still, and his wife, Rhonda Still. The article alleged that Mr. Still "was arrested and charged with assault and battery and disorderly conduct ... in connection with an attack on his wife." The article further stated that Mrs. Still "was apparently sitting in her car when her husband struck her in the face dislocating her jaw and breaking her nose." Although Wilder reported that Mr. Still had been charged with a criminal act, in fact, he had not. Wilder's article was based on a police incident report that incorrectly stated that charges had been filed.

Mr. and Mrs. Still swore out separate arrest warrants, on separate days, alleging that Wilder had violated the criminal libel statute. Affidavits signed by the Stills charged Wilder with maliciously publishing and circulating a false story, in *The Banner* article and in a radio broadcast from WBAW, a station which Wilder managed. These affidavits also maintained that the stories had injured the reputations of Mr. and Mrs. Still. Following his arrests in connection with these statements, Wilder was released on personal recognizance. Both of the warrants issued against Wilder were dismissed by the Solicitor of the Second Circuit at the preliminary hearing stage.

## III

## HISTORICAL BACKGROUND OF CRIMINAL LIBEL

Criminal libel is notoriously intertwined with the history of governmental attempts to suppress criticism. The notion that expression may be penalized goes back at least as far as 880 A.D. when Alfred the Great decreed that "[i]f anyone is guilty of public slander, and it is proved against him, it is to be compensated with no lighter penalty than the cutting off of his tongue...." [5] Throughout the centuries, criminal libel has experienced what one court has referred to as an "ignominious history." [6] One commentator has suggested that the law of defamation is "a forest of complexities, overgrown with anomalies, inconsistencies, and perverse rigidities." [7]

In medieval England, prosecutions for libel were originally under the jurisdiction of the ecclesiastical courts,[8] but as early as 1275, the royal courts assumed jurisdiction over seditious libel, the branch of libel dealing with false statements about the affairs of the state and those who administered the government.[9] The most notorious example of the use of the criminal law to punish seditious libel occurred in the royal Court of Star Chamber.[10] There, truth was not a defense, and a defendant was not entitled to a jury trial on the issue of whether the alleged statement was defamatory. Eventually, the Star Chamber's use

---

**4.** Representative Gordon was later indicted and convicted for violation of the Hobbs Act, 18 U.S.C. § 1951 (1988). His case is now pending on appeal.

**5.** Lovell, *The "Reception" of Defamation by the Common Law*, 15 Vand.L.Rev. 1051, 1053 (1962) (citing 1 *English Historical Documents* 372, 378 (Whitelock ed. 1955)).

**6.** *Tollett v. United States*, 485 F.2d 1087, 1094 (8th Cir.1973).

**7.** Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349, 1350 (1975).

**8.** R. Smolla, *Law of Defamation* § 1.02, at 1–4 (1991).

**9.** Kelly, *Criminal Libel and Free Speech*, 6 Kan. L.Rev. 295, 297 (1958).

**10.** Eaton, *supra note 7*, at 1350.

of criminal libel was adopted by the common-law courts in England, which at least provided trials by jury.[11]

The modern law of criminal libel is said to have its origin in *De Libellis Famosis*,[12] which arose out of a libel in verse directed against the Archbishop of Canterbury, then deceased, and a living Bishop. Lord Coke analyzed the principal points resolved:

Every libel is made either against a private man, or against a magistrate or public person. If it be against a private man it deserves a severe punishment, for although the libel be made against one, yet it incites all those of the same family, kindred or society to revenge, and so tends *per consequens* to quarrels and breach of the peace, and may be the cause of the shedding of blood and great inconvenience; if it be against a magistrate, or other public person, it is a greater offense; for it concerns not only the breach of the peace, but also the scandal of Government; for what greater scandal of Government can there be than to have corrupt and wicked magistrates to be appointed by the King to govern his subject under him? [13]

Thus, one of the principal rationales for punishing private libels was that they tended toward breach of the peace. A corollary to this proposition was that truth was irrelevant; in fact the true insult was considered more likely to give offense "for, as the woman said, she would never grieve to be told of her red nose if she had not one indeed." [14]

In the colonies, the law of criminal libel was applied against critics of the Crown with equal ferocity. A New York publisher's attack of the colonial governors in 1735 led to the famous trial of John Peter Zenger. Indicted for criminal libel, he was defended by Andrew Hamilton, who sought to have the jury pass on his defense of truth. The royal judge denied this defense, but the jury disregarded the charge and acquitted Zenger.[15] Zenger's case became a symbol of the oppressions of the Crown during the revolution.

With the establishment of independence, the states adopted new constitutions with guarantees of freedom of speech and the press, the first being that of Virginia in 1776.[16] By the opening of the Constitutional Convention in 1787, eleven states had such provisions embodied in their constitutions or bill of rights.[17] Such was the background of the First Amendment. The free speech provisions of the federal and state constitutions were the subject of much debate among those who had enacted them, but it seems probable that one of the principal targets at which they were aimed was the law of seditious libel, that branch of criminal libel law which had been used to control criticism of the government.

Ironically, in 1798, less than a decade after ratification of the First Amendment, Congress passed the Alien & Sedition Act, which made it a crime, punishable by five years in prison and a $5,000 fine, to:

write, print, utter or publish ... any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress ... or the President ... with intent to defame ... or to bring them, or either of them, into contempt or disrepute; or to excite against them or either or any of them, the hatred of the good people of the United States.[18]

The Alien & Sedition Act was immediately and vigorously attacked as unconstitutional by Thomas Jefferson and James Madison, and the Virginia legislature passed the fa-

---

**11.** R. Smolla, *supra note 8*, § 1.02, at 1–4.

**12.** 77 Eng.Rep. 250 (1609).

**13.** *Id.* at 251 (quoted in Kelly, *supra note 9*, at 301).

**14.** Kelly, *supra note 9*, at 301.

**15.** *See generally*, Alexander, *A Brief Narrative of the Case and Trial of John Peter Zenger, Printer*

*of the New York Weekly Journal, reprinted in*, S. Presser & J. Zainaldin, *Law and Jurisprudence In American History* 31–54 (2d ed. 1989).

**16.** Kelly, *supra note 9*, at 308.

**17.** *Id.*

**18.** 1 Stat. 596 (1798).

mous Virginia Resolutions of 1798 condemning it, saying that the Act exercised:

"a power not delegated by the Constitution, but, on the contrary, expressly and positively forbidden by one of the amendments thereto—a power which, more than any other, ought to produce universal alarm, because it·is levelled against the right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other right." [19]

The Alien & Sedition Act expired of its own terms in 1800, and was never tested in a court; however, "the attack upon its validity has carried the day in the court of history." [20] Thomas Jefferson pardoned those convicted under it, and Congress voted to repay fines levied under it. [21] John C. Calhoun, in an 1836 report, assumed that its invalidity was a matter "which no one now doubts." [22]

Although the Act by its terms only applied to criticism of government itself, Madison, left no doubt that he believed the same strictures applied to any attempt to punish criticism of public officials, or candidates for office. In his report supporting the Virginia Resolutions, he wrote:

"[I]t is manifestly impossible to punish the intent to bring those who administer the government into disrepute or contempt, without striking at the right of freely discussing public characters and measures; ... which, again, is equivalent to a protection of those who administer the government, if they should at any time deserve the contempt or hatred of the people, against being exposed to it,

by free animadversions on their character and conduct.

.　　.　　.　　.　　.

Let it be recollected, lastly, that the right of electing members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." [23]

In South Carolina, criminal libel was, at common law, a misdemeanor. As in England, truth was not originally a defense to a prosecution for libel. [24] This defect, however, was cured by the State Constitution of 1868, which, along with providing for trial by jury, provided that truth is a defense to criminal libel. [25] This provision was carried forward to the 1895 South Carolina Constitution. [26] Interestingly, the constitutional provision also states that the jury "shall be the judges of the law and facts." [27]

The statute under challenge here was enacted in 1912. It provides as follows:

Any person who shall with malicious intent originate, utter, circulate or publish any false statement or matter concerning another the effect of which shall tend to injure such person in his character or reputation shall be guilty of a misdemeanor and, upon conviction therefor, be subject to punishment by fine not to exceed five thousand dollars or by imprisonment for a term not exceeding one year, or by both fine and imprisonment, in the discretion of the court; provided,

**19.** *New York Times Co. v. Sullivan,* 376 U.S. 254, 274, 84 S.Ct. 710, 723, 11 L.Ed.2d 686 (1964).

**20.** *Id.* at 276, 84 S.Ct. at 723.

**21.** Kelly, *supra note 9,* at 405.

**22.** *New York Times,* 376 U.S. at 276, 84 S.Ct. at 724.

**23.** *Id.* at 275 n. 15, 84 S.Ct. at 723 n. 15.

**24.** *State v. Lehre,* 4 S.C.L. (2 Brev) 446 (1811).

**25.** S.C. Const. of 1868, art. I, § 8 ("In prosecutions for the publication of papers investigating the official conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libel, the jury shall be the judges of the law and the facts").

**26.** S.C. Const., art. I, § 16.

**27.** *Id.*

that any right any person may have by way of an action for damages for libel or slander.[28]

As noted above, outside the area of libels on government and public officials, the original rationale for the criminal libel law was to prevent breach of the peace through duelling and violence associated with insulting speech. The statute, however, no longer makes breach of the peace, or tendency to such breach, an element of the offense. Rather, it defines the offense in terms of injury to character or reputation.[29]

## IV

## CONCLUSIONS OF LAW

The plaintiffs contend that the criminal libel statute is constitutionally infirm because it does not incorporate a requirement that the defamatory language be made with actual malice as required by decisions of the United States Supreme Court. Before reaching the merits of the controversy, however, the court must address two threshold legal issues raised by the defendant.

### A. Standing

 The defendant contends that the plaintiffs lack standing to bring this action. The court disagrees. Generally, the "question of standing depends upon whether the party has alleged such a personal stake in the outcome of the controversy as to ensure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." [30] The Supreme Court in *Bigelow v. Virginia* [31], however, recognized an expanded standing status in First Amendment cases:

> We give a defendant standing to challenge a statute on grounds that it is facially overbroad, regardless of whether his own conduct could be regulated by a more narrowly drawn statute, because of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." [32]

Fitts and Wilder have both been subject to the state's criminal prosecutions for alleged violations of the criminal libel statute. Fitts was arrested, jailed, and indicted. Wilder was arrested twice. Having been subjected to the state's criminal process and exposed to future prosecution under the statute, both Fitts and Wilder satisfy the expanded standing status recognized by the United States Supreme Court in cases in which statutes are attacked as overbroad under the First Amendment. Fitts and Wilder both have the requisite personal stake in the outcome of the controversy to provide standing.[33]

---

28. S.C.Code Ann. § 16–7–150 (Law.Co-op.1976).

29. *Id.* Although breach of the peace is no longer an element of the offense, the criminal libel statute is codified under laws dealing with "offenses against the peace." Because the First Amendment has been interpreted to condemn only that language posing a "clear-and-present" danger of violent conduct, the rationale for criminal libel statutes has shifted to the protection of reputation. *Garrison v. Louisiana,* 379 U.S. 64, 69–70, 85 S.Ct. 209, 213, 13 L.Ed.2d 125 (1964).

30. *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972) (citations omitted).

31. 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

32. *Id.* at 816, 95 S.Ct. at 2229–30 (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963)).

33. *Bigelow v. Virginia,* 421 U.S. 809, 817, 95 S.Ct. 2222, 2230, 44 L.Ed.2d 600 (1975) (standing requirements are "surely ... met under the circumstances of this case, where the threat of prosecution already has blossomed into the reality of a conviction, and where there can be no doubt concerning the appellant's personal stake in the outcome of the controversy"). One could well argue that Fitts' article would have been defamatory even under a *New York Times/Garrison* analysis. However, even if his speech was unprotected, he still has standing to raise the constitutional issue. This is because a broadened rule of standing applies in First Amendment cases. As noted by the Alaska court in *Marks v. City of Anchorage,* 500 P.2d 644, 656 n. 7 (Alaska 1972):

> [T]o protect first amendment freedoms, the Court has allowed "vicarious" assaults on invalid statutes; a defendant need not show that his conduct was itself entitled to protection as a prerequisite to successful attack on an overbroad or vague statute. *See generally,* Note, *The First Amendment Overbreath Doctrine,* 83 Harv.L.Rev. 844 (1970).

The court also finds that Wyrick and the two classes of plaintiffs have standing as well. Wyrick and the speaker class have a realistic apprehension of prosecution under the statute in that the publicity about the prosecutions of Fitts and Wilder has drawn the attention of the public to the existence of the statute and has made prosecution more likely by those offended by the speech, writings, broadcasts, or other communication of Wyrick and the speaker class. The reader class is also affected by the criminal libel statute in an independent way in that the threat of prosecution chills the freedom of speech of the speakers and thus reduces the amount of information and the range of opinion and viewpoint available for the readers to receive.

The court also finds that the two associational plaintiffs, the SCPA and the ACLU, have standing. Organizations such as these may have standing to litigate claims if (1) their members would otherwise have standing to sue in their own right; (2) the interests they seek to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[34] Each of these three requirements must be met by a litigant asserting associational standing.[35]

The court finds that all three requirements are fulfilled by the SCPA and the ACLU. The SCPA has standing as the representative of its members, the publishers of eighty-eight newspapers in the state of South Carolina, the employees of which would be subject to potential prosecution under the statute. Standing through the SCPA is particularly appropriate when the SCPA seeks prospective relief in the form of an injunction or declaration and such relief, if granted, would inure to the benefit of its members.[36] The ACLU, has members who frequently take controversial public positions on public officials, public figures, and matters of public concern. It, like the SCPA, has a sufficient stake in the controversy, on behalf of its members, to bestow standing upon that litigant.

### B. Abstention

The defendant next asserts that this court should abstain from deciding the constitutional issue presented in this case so as to allow the South Carolina courts the opportunity to interpret the term "malicious intent" in the criminal libel statute.

In *Railroad Commission of Texas v. Pullman Co.*[37] the United States Supreme Court created an abstention doctrine that directs a federal court to abstain when (1) a state law is ambiguous and unsettled, (2) the state courts have not had an opportunity to interpret the state law, and (3) a constitutional determination will be avoided by the state's interpretation of its law.[38] The purpose of *Pullman* abstention is to "avoid difficult constitutional questions and awkward state-federal confrontations ... [and] to avoid interference with important state functions and tentative decisions on questions of state law."[39]

The defendant alleges that the words "malicious intent" are ambiguous because no appellate court in South Carolina has had the opportunity to judicially limit the statute to meet the constitutional standards set forth in *New York Times Co. v. Sulli-*

---

**34.** *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

**35.** *Associated Gen. Contractors v. Otter Tail Power Co.,* 611 F.2d 684 (8th Cir.1979).

**36.** *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *National Motor Freight Ass'n v. United States,* 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963).

**37.** 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

**38.** *See id.* at 499–500, 61 S.Ct. at 644–45; *see also Harrison v. NAACP,* 360 U.S. 167, 176, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959) ("the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them").

**39.** M. Reddish, *Federal Jurisdiction* 282 (2d ed. 1990).

*van.*[40] The defendant asserts that the South Carolina Supreme Court could judicially interpret "malicious intent" as meaning actual malice pursuant to the *New York Times* definition. Thus, the defendant argues that the constitutional issue, whether the criminal libel statute is overbroad and vague, could be avoided by such an interpretation by the state court.

■ A federal court, however, should not abstain if abstention will not avoid the constitutional determination.[41] The five state supreme courts that have reviewed the constitutionality of criminal libel statutes around the country have all refused to judicially limit them to meet federal constitutional requirements. Instead, all five courts struck down the statutes on constitutional grounds and left the revisions to the state legislatures.[42] In *Gottschalk v. State*[43] the Alaska Supreme Court explained:

> If we were to engage in the process of narrowing suggested by the State, after striking AS 11.15.320 we would then have to decide whether AS 11.15.310 should be limited only to cases of private defamation or should apply to defamation of public officials, public figures or concerning public issues; whether truth should be an absolute or conditional defense to private defamation; and, whether a private false defamation which is neither knowingly nor recklessly false should be criminal. The variety of these choices underscores the essentially legislative nature of the task of bringing our defamation statutes within constitutional bounds.[44]

The South Carolina Supreme Court has also recognized that courts generally should not invade the province of the legislature by judicially rewriting state statutes.[45]

The defendant correctly notes that in the area of civil defamation the courts of South Carolina have modified the elements of the tort by court action.[46] The civil actions for libel and slander in South Carolina, however, are common-law torts. As such, they

---

**40.** 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The term "malicious intent" is not necessarily ambiguous. Under South Carolina common law, "actual malice" means acting with "ill-will towards the plaintiff, or ... act[ing] recklessly or wantonly." *Padgett v. Sun News*, 278 S.C. 26, 292 S.E.2d 30, 34 (1982). Because the criminal libel statute was initially adopted in 1912, it is likely that the term "malicious intent" was intended to adopt the common law malice standard in place at that time.

Former Arkansas statute § 41–2401 defined libel as a "malicious defamation." *See Weston v. State*, 258 Ark. 707, 528 S.W.2d 412, 414 n. 1 (1975). In *Weston* the Arkansas Supreme Court held that the "language of the statute here involved is clear and unambiguous, and this Court has no authority to amend the statute to conform to the rules laid down by the U.S. Supreme Court in *New York Times* and *Garrison*." *Id.* 528 S.W.2d at 416.

**41.** *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

**42.** *See Gottschalk v. State*, 575 P.2d 289, 296 (Alaska 1978); *Weston v. State*, 258 Ark. 707, 528 S.W.2d 412, 416 (1975); *Eberle v. Municipal Court, Los Angeles Judicial District*, 55 Cal. App.3d 423, 433, 127 Cal.Rptr. 594, 600 (1976) (judicial limitation of the statute to meet the *Times* standard would "[require] a wholesale rewriting, and any attempt at draftsmanship on our part would transgress both the legislative intent and the judicial function"); *Boydstun v. State*, 249 So.2d 411, 414 (Miss.1971); *Commonwealth v. Armao*, 446 Pa. 325, 286 A.2d 626, 632 (1972) (to "re-draft the criminal libel statutes in accordance with First Amendment requirements ... would [require the court] to undertake a wholly inappropriate judicial activity amounting to judicial legislation").

**43.** 575 P.2d 289 (Alaska 1978).

**44.** *Id.* at 296 n. 18.

**45.** *State v. Blackmon*, 403 S.E.2d 660, 662 (S.C. 1991) ("it is not within our province to amend the law to resolve this inconsistency [between state gambling laws and gaming machine laws], rather, we leave to the legislature the resolution of this matter"); *Coker v. Nationwide Ins. Co.*, 251 S.C. 175, 161 S.E.2d 175, 178 (1968) ("We have no right to legislate the provision from the statute or to modify its application under the guise of judicial interpretation").

**46.** *See Sanders v. Prince*, 403 S.E.2d 640, 642 (S.C.1991) (error for trial judge to charge common law malice in defamation action brought by school board members); *Scott v. McCain*, 272 S.C. 198, 250 S.E.2d 118 (1978) (civil action for libel by school board members must allege actual malice as that term is used in *New York Times*).

may be more appropriately modified by judicial action. If the matter before the court involved a common-law crime, then the argument for abstention would be more compelling because the courts of South Carolina would have greater authority and inclination to alter the essential elements of the offense.

Because the South Carolina Supreme Court could not judicially interpret the South Carolina criminal libel statute without invading the legislative function,[47] it is inappropriate for this court to abstain.[48] In other words, if this court abstained and allowed the issue to reach the South Carolina Supreme Court, that court probably could not judicially interpret the term "malicious intent" but would have to decide the constitutional issue. Because the constitutional issue would not be avoided, *Pullman* abstention is inappropriate.

■ The United States Supreme Court has also recognized in several cases that a federal court should be particularly hesitant in abstaining in cases involving First Amendment violations.[49] One commentator, citing these cases as authority, stated:

Even in situations where the traditional criteria for *Pullman* abstention have

been met, the Court may hesitate to order abstention when the resulting delay might significantly undermine fundamental constitutional guarantees. Delay may be particularly harmful in cases which involve a first amendment challenge, since the longer the delay in obtaining a final decision on the constitutional question the greater the chill on the exercise of the first amendment right that may result.[50]

Given the special nature of the First Amendment concerns present in this case, it is appropriate that the court exercise its jurisdiction and decide the issue on the merits.

■ Even if the defendant had shown that abstention was otherwise appropriate, the exception to *Pullman* abstention set out in *Dombrowski v. Pfister*[51] would be controlling. In that case, members of a civil rights organization sought declaratory and injunctive relief in federal district court restraining state officials from prosecuting them for violations of Louisiana's Subversive Activities and Communist Control Law and its Communist Propaganda Control Law. The plaintiffs alleged that:

---

**47.** Following the defendant's argument that the "interpretation" would be a simple task, the defendant concedes that the statute, after the judicial "interpretation," would apply equally to private and public figures. Otherwise, the supreme court would have to make wholesale revisions in the statute to provide separately for public and private figures.

This court finds, consistent with the decisions of five other state supreme courts, that the South Carolina Supreme Court probably could not simply make a judicial interpretation. Rather, an attempt at modifying the statute would require policy decisions regarding the statute's application to public and private figures.

**48.** In *Ohio Bureau of Employment Serv. v. Hodory,* 431 U.S. 471, 481, 97 S.Ct. 1898, 1905, 52 L.Ed.2d 513 (1977), the Court held, "Pullman abstention is an equitable doctrine that comes into play when it appears that abstention may eliminate or materially alter the constitutional issue presented. There is a point, however, at which the possible benefits of abstention become too speculative to justify or require avoidance of the question presented." *See also Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964) ("The abstention doctrine is not an automatic rule applied when-

ever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers"). In this case, the possibility that the supreme court might judicially amend the statute instead of deciding the constitutional issue is too speculative to justify the delay.

**49.** *Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) *overruled on other grounds by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) ("we are mindful of the high cost of abstention when the federal constitutional challenge concerns facial repugnance to the First Amendment"); *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Baggett v. Bullitt,* 377 U.S. 360, 378–79, 84 S.Ct. 1316, 1326–27, 12 L.Ed.2d 377 (1964) (abstention causes delay and as "a result [is] quite costly where the vagueness of a state statute may inhibit the exercise of First Amendment freedom").

**50.** M. Reddish, *Federal Jurisdiction,* 284 (2d ed. 1990).

**51.** 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

the threats to enforce the statutes against appellants are not made with any expectation of securing valid convictions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of Negro citizens of Louisiana.[52]

The Court held that abstention was inappropriate when a state statute is applied in bad faith for the purpose of discouraging free speech and when the plaintiffs are deprived of an adequate opportunity to vindicate their constitutional rights.

In *Dombrowski* the Court further stated, "[w]hen the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical.... The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases." [53]

In the present case, the principles of *Dombrowski* are applicable. First, the constitutional challenge is based upon the overbreadth and vagueness of a state statute, which allegedly impinges upon plaintiffs' protected First Amendment rights. Second, the statute has been used for purposes of silencing the media.[54] Third, the plaintiffs are being denied an opportunity to vindicate their constitutional rights because the criminal charges are being dropped prior to trial.[55] Moreover, it appears that the criminal libel statute is being used in bad faith to harass journalists and to discourage them from exercising free speech. Therefore, this case fits squarely within the exception to the abstention doctrine outlined in *Dombrowski*.

For the foregoing additional reasons, the court finds that abstention under these circumstances would be inappropriate.

### C. Constitutional Merits

▇▇▇ Having concluded that the plaintiffs in this action have the requisite standing and that this court should not abstain from deciding the controversy, the court turns to the merits of the dispute. The plaintiffs contend that the criminal libel statute does not pass constitutional muster because it is both overbroad and vague. The court agrees in both respects.

▇▇▇▇▇ State statutes are presumed to be constitutional.[56] This presumption of constitutionality will prevail unless there is a "clear showing that [the statute] transgresses constitutional limitations." [57] One who challenges the constitutionality of a statute assumes the burden of proving that it is unconstitutional.[58] Further a court "should avoid a statutory interpretation which raises constitutional questions if there is a reasonable reading of the statute which does not raise those issues." [59] Likewise, an unconstitutional construction of a

---

52. *Id.* at 482, 85 S.Ct. at 1118–19.

53. *Id.* at 486, 85 S.Ct. at 1120–21.

54. In the case of Fitts, the apparent victims of the alleged libel, Senator McGill and Representative Gordon, swore out a warrant and had Fitts arrested. Fitts was released with an order not to continue to disseminate such information or opinion. After the state elections of both legislators were completed, the legislators dropped the charges against Fitts. The use of the criminal libel statute for the purpose of silencing an adverse member of the media until after an election constitutes a bad faith use of the statute by state officials.

55. It is also noteworthy that the SCPA has made several efforts to have S.C.Code § 16–7–150 repealed or otherwise amended. On each occasion the South Carolina General Assembly has apparently refused to repeal the statute or to amend it to meet the *New York Times* constitutional standards. Therefore, the SCPA sought declaratory relief in federal court as a last resort.

56. *South Carolina State Highway Department v. Barnwell*, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938).

57. *National Mut. Ins. Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 604, 69 S.Ct. 1173, 1184, 93 L.Ed. 1556 (1949).

58. *Wirtz v. Edisto Farms Dairy*, 242 F.Supp. 1, 5–6 (D.S.C.1965).

59. *Bob Jones University v. Johnson*, 396 F.Supp. 597, 608 (D.S.C.1974).

statute must be avoided by the courts if it is possible.[60]

The United States Supreme Court has recognized that restrictions and burdens placed on the exercise of First Amendment freedoms are often inconsistent with the societal value of having an unfettered exchange of information. In *Broadrick v. Oklahoma,*[61] the Court stated:

> It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society.

■ To be constitutionally acceptable, a statute restricting or imposing a burden on the exercise of First Amendment rights must not be drawn or construed so broadly as to allow punishment of protected speech. As the United States Supreme Court stated in *Gooding v. Wilson,*[62] "the statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be suspectable of application to protected expression." Thus, prohibitions or restrictions on the exercise of First Amendment rights that intrude upon protected speech are unconstitutionally overbroad.[63]

The requirement that a statute affecting First Amendment rights be narrowly drawn or authoritatively construed flows from the belief that the risk of harm to society in permitting some unprotected speech to go unpunished is outweighed by the prospect that protected speech may be muted by overbroad statutes.[64]

The test to be applied to the South Carolina criminal libel statute then is whether by its language the statute sweeps within its ambit speech that is protected by the First and Fourteenth Amendments. As a starting point, it is appropriate to compare and contrast the language of the statute with the prevailing scope of libel contained in applicable Supreme Court decisions.

■ In 1964 the United States Supreme Court added a constitutional dimension to the law of libel, and in *New York Times Co. v. Sullivan,*[65] held that in the case of public officials, no recovery of damages will be permitted for the publication of a defamatory falsehood, except upon proof that the statement was made with "actual malice." A statement is made with "actual malice" when it is made "with knowledge that it was false or with reckless disregard of whether it was false or not."[66]

To provide the same degree of protection to speech regarding public officials being criticized in the conduct of their official duties, the South Carolina criminal libel statute would be required to have language restricting its application to those circumstances in which defamatory falsehoods were published and at the time of publication the publisher knew the information was false or had a reckless disregard of its potential falsity. The "actual malice" standard for imposition of sanctions has been applied to establish a threshold for criminal liability as the United States Supreme Court held in *Garrison v. Louisiana:*[67]

> We held in *New York Times* that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with

**60.** *Springs Mills, Inc. v. Consumer Product Safety Comm'n,* 434 F.Supp. 416 (D.S.C.1977).

**61.** 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830 (1973).

**62.** 405 U.S. 518, 522, 92 S.Ct. 1103, 1106, 31 L.Ed.2d 408 (1972).

**63.** *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1972); *Brandenburg v.*

*Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

**64.** *Broadrick,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

**65.** 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**66.** *Id.* at 279–80, 84 S.Ct. at 726.

**67.** 379 U.S. 64, 74, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964).

knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in *New York Times* [citation omitted] apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since "... erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing' space that they 'need to survive' ..." [citation omitted], only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions.

The *New York Times* "actual malice" standard applies in civil and criminal cases when the discussion concerns public affairs.[68] The *New York Times* standard also has been applied in the civil context in situations in which public figures, as distinguished from public officials, complain of defamation.[69] No justification exists to preclude application of this standard to criminal prosecutions initiated by public figures claiming to have been defamed. Application of the standard in criminal prosecutions initiated by public figures is wholly consistent with the rule established by *Garrison*.

■ Under the "actual malice" standard of *New York Times*, no criminal liability for libel may be imposed in connection with the discussion of public affairs unless the publisher of a falsehood knows it was false at the time it was published or had a reckless disregard of whether it was false or true. The South Carolina criminal libel statute lacks the high degree of protection afforded free expression by the "actual malice" standard, and allows the imposition of criminal penalties with no showing that the publisher knew the information being published was false or had a high degree of awareness of its probable falsity. Absent such a threshold, the South Carolina criminal libel statute is unconstitutional on its face because it would allow the prosecution of publishers of false information even if the publisher did not know the information was false, or if the publisher had no reckless disregard of probable falsity.

■ The South Carolina criminal libel statute makes reference to malice, but only in the context of "malicious intent." This term is not synonymous with the "actual malice" standard of *New York Times*. The "malicious intent" language of the South Carolina statute makes reference to malice in the context of the South Carolina common law of libel in which it means "ill-will towards the plaintiff or actions taken with conscious indifference towards the plaintiff's rights."[70] As the United States Supreme Court held in *Beckley Newspapers Corp. v. Hanks*,[71] the common law standard of malice—motivated by ill-will or a desire to injure the plaintiff—does not satisfy the requirement that a publisher know the information published is false or that it is being published with a reckless disregard of whether the statements are false. Clearly, the common-law malice standard of the South Carolina criminal libel statute is not the equivalent of the "actual malice" standard required by *New York Times* and *Garrison*. With the much lower common-law malice standard as the threshold for sanctions under the South Carolina criminal libel statute, publishers of erroneous statements that are "inevitable" in free debate, can be subjected to criminal punishment even though such publication is "immunized from governmental control by the Constitution." A statute which permits punishment for the publica-

---

**68.** *Id.*

**69.** *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

**70.** *Padgett v. Sun News*, 278 S.C. 26, 292 S.E.2d 30, 34 (1982).

**71.** 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967).

tion of protected speech is overbroad.[72] An overbroad statute is unconstitutional and void.[73] Therefore, the South Carolina criminal libel statute is facially unconstitutional.[74]

▮▮▮▮ The plaintiffs also contend that the criminal libel statute is unconstitutionally vague. A statute is "void for vagueness" when its terms are "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."[75] Laws must be written so as to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."[76] When a statute touches the area of free expression, the requirements of preciseness are most strictly applied as the government is permitted by the Constitution to regulate only with narrow specificity.[77] To avoid chilling the exercise of vital First Amendment rights, restriction of expression must be expressed in terms which clearly inform citizens of prohibited conduct and in terms susceptible of objective measurement.[78] To the extent that the South Carolina Statute uses the term "malice" the statute is void for vagueness. The ambiguity in the term malice creates the possibility of confusion between the common law use of this word and the *New York Times* constitutional definition.

The plaintiffs urge that the court declare other provisions of the statute unconstitutionally vague as well. It is argued that nothing in the criminal libel statute gives warning to a citizen that a particular expression is prohibited. The plaintiffs contend that a statute proscribing a "false statement ... the effect of which shall tend to injure ... character or reputation ..." licenses the jury to create its own standard in each case. The court disagrees. Except for the term malice, all the words of the statute in question are sufficiently precise so that a person of ordinary intelligence is placed on notice of what conduct is prohibited. Accordingly, the court declines to find the statute void as unconstitutionally vague, except insofar as the statute does not distinguish between common-law malice and constitutional malice.

▮▮▮ An interesting problem of vagueness arises when one considers the state constitutional provision, which requires, in criminal libel cases, the jury to decide both the facts and the law.[79] The statute here in question, of course, does not give the jury unbridled license to determine what the law is in a criminal libel case, but the South Carolina Constitution so provides. One could conceivably argue that, in a criminal libel trial in South Carolina, the defendant, as well as the state, could insist that the state constitutional provision controls over the statute, and that the jury must be instructed that it is the sole judge of the law. As noted above, the constitutional provision was a response to the unjust English rule which did not allow truth as a defense and did not provide for jury trials on the issue.[80] However, the final

**72.** *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

**73.** *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

**74.** Because the court has found that the South Carolina criminal libel statute is facially unconstitutional, the court need not decide whether it is unconstitutional as applied.

**75.** *Connally v. General Constr. Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1925).

**76.** *United States v. Biocic,* 928 F.2d 112, 114 (4th Cir.1991).

**77.** *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

**78.** *Id.*

**79.** S.C. Const. art. I, § 16.

**80.** The desire to avoid the harsh English rule is apparent from the debate surrounding the adoption of article one, section eight of the 1868 Constitution. As originally proposed, the provision provided, in pertinent part, that "in all indictments for criminal libel, the jury shall determine the law *under the direction of the court.*" *Proceedings of the Constitutional Convention* 282 (1868) (emphasis added). Immediately, J.S. Craig, a convention delegate from Colleton County, challenged the entire section, contending that it "appear[ed] vague and susceptible of different constructions." *Id.* A spirited discussion then ensued. F.J. Moses, of Sumter—after suggesting that "to put [jurors] in

sentence, giving the jury the authority to decide what the law is, swings too far in the opposite direction. Arguably, in such a trial, the jury would not be instructed at all, and counsel would be free to argue for any interpretation of the law they fancied or they thought the jury would accept.

In *State v. Syphrett*,[81] the South Carolina Supreme Court confronted this issue. The trial judge charged the jury on the law of libel, and the solicitor objected to the jurisdiction of the Supreme Court to hear and decide the appeal because the constitution made the jury the judges of the law. The solicitor argued that the provision in the constitution[82] meant:

> [T]he jury was put beyond the discretion and control, although entitled to the advice, of the court. It was equivalent to repealing and wiping out all general and uniform law in this state as to libel. There is now a special law for each case, and each jury enacts that law. What writings are libelous, what is sufficient publication, what intent or motive must be shown to constitute the offense, are all as much questions for the jury, and

exclusively for the jury, as are the facts of the case, and there can therefore be no appeal from their finding.[83]

The court, however, rejected this argument, and held that "it is not only the right, but the duty, of the presiding judge, upon the trial of indictments for libel, to declare to the jury the law applicable thereto; and if he errs in so doing, such errors may be reviewed on appeal...."[84]

The meaning and affect of this constitutional provision, however, is far from clear. In *State v. Bailey*,[85] Justice Willard stated that the object of such a constitutional provision is "to commit the right of parties to the dictates of natural law that resides in the breast of the citizen, rather than to the deductions of formal and scientific law, as administered by the Courts."[86]

In *State v. Brock*,[87] the court overruled a conviction because the trial court charged the jury that the truth of a statement was not a complete defense but was only a mitigating factor. The court stated:

> [T]he Constitution of 1895 [art. I, § 21] went further and threw wide open the

a box and tell them they are qualified to judge the law is the most preposterous proposition I ever heard of," *id.* at 283—told the delegates that if the provision were adopted, "the blood of many an innocent man will be upon the head of the members of this convention." *Id.* at 284.

After several other delegates addressed the issue, Dr. A.G. Mackey, a delegate from Charleston, rose to deliver one of the longest speeches of the convention. He said that the effort to remove the provision from the Constitution was "a proposition to bring us back to the days of the Star Chamber decisions, to the days when Judges joined with oppressive governments to put their heels on the necks of the people." *Id.* at 296. To delete the measure, he argued, would be to

> fling away all that we have gained through the glorious revolutionary period of the past, and submit ourselves, not to the decisions of our peers, but to the decisions of Judges—Judges who from time immemorial, with few exceptions, have always been on the side of oppression and tyranny—I boldly proclaim the fact that if you trust your liberties to the Judges of any country, your liberties are gone.

*Id.* Mackey then proceeded to recite the history of the law of criminal libel in England, pointing out that when "that iniquitous body—the Star Chamber" was established, the right of the jury "was taken from the people." *Id.* at 298. Concluding, he told the delegates,

> I should certainly be sorry to see the Convention of South Carolina, one half of whose members are men who have just been liberated from bondage and from the heel of the oppressor, going back to the old times [of England] and declaring that the liberties of the people shall depend no longer upon the decision of their peers—the juries of the country ... and that they are willing to throw themselves, body and soul, into the power of a judge....

*Id.* at 300. Mackey then moved that the phrase "under the direction of the court" be stricken so that there would be no ambiguity over whether the jury was the sole judge of the law. His motion carried and the provision was added to the Constitution with "but two dissenting votes." *Id.* at 303.

81. 27 S.C. 29, 2 S.E. 624 (1887).

82. S.C. Const. of 1868, art. I, § 8.

83. 2 S.E. at 626.

84. *Id.* at 627.

85. 1 S.C. 1 (1868) (dictum).

86. *Id.* at 6.

87. 61 S.C. 141, 39 S.E. 359 (1901).

door to all persons who were indicted or prosecuted for libel to show the truth of said libel; making the jury judges of the law and the facts. *It is no part of the duty of a court to expand or construe that which is plain.* You cannot make, by discussion, anything plainer, which, by the words used is already plain.[88]

The court did not overrule the conviction because the trial judge wrongly interpreted the law, rather, because the judge commented on the meaning of the law. Thus, it appears that the South Carolina Supreme Court in *Brock* held that it was improper for the trial court to charge the jury as to the meaning of the elements of the offense; instead the judge should charge the jury merely that the truth may be put into evidence and that the jury is the judge of the law and facts.

Although the notion that the jury has the authority to decide what the law is does have historical antecedents,[89] such a practice unquestionably would violate the due process clause of the United States Constitution. Although the court has declared the statute unconstitutional on other grounds, any attempt to re-enact a criminal libel statute, which includes a correct definition of actual malice, should also take into account the state constitutional problem mentioned herein.

■ The intervenor-plaintiffs urge the court to go further and hold that criminal libel is no longer a viable concept, at least insofar as it involves public speech. It is argued that criminal libel is simply incompatible with the free speech and free press guarantees of the First Amendment. In other words, this court is urged to go beyond the holdings of the United States Supreme Court in *New York Times* and *Garrison* and hold that *any* criminal libel statute would be unconstitutional if it imposes criminal penalties on speech regarding a public official, public figure, or matter of public concern. The intervenor-plaintiffs point to the near desuetude of criminal libel legislation in this country[90] and allude to the fact that criminal libel was all but eliminated from the American Law Institute's Model Penal Code in 1961.[91] The intervenor-plaintiffs argue that if the statute were redrafted so as to narrowly define malice in the constitutional sense, individuals wishing to chill First Amendment rights of others would simply be required to include an additional phrase in their arrest warrants.

Although the court has determined that the current statute, as presently drafted, is impermissibly overbroad and vague, the court is not prepared to accept the intervenor-plaintiffs' argument that all criminal libel statutes are *per se* unconstitutional. In *Garrison*,[92] the United States Supreme Court clearly indicated that appropriately drafted criminal libel statutes would pass constitutional muster.

In addition to seeking a declaration that the criminal libel statute is unconstitutional, the plaintiffs sought injunctive relief against the defendant, Solicitor Kolb. At

---

**88.** *Id.* at 363 (emphasis added).

**89.** Strange as it may seem, the proposition that jurors should be the judges of the law as well as the facts is a part of our judicial heritage. As noted by Judge William W. Schwarzer:

> In the early years of the Republic, the independence of the jury found strong support in state legislatures. Jurors were lauded as spokesmen for the common sence and shared ethics of the citizenry. Judges frequently gave no instructions at all, relying on the jurors to be "good judges of the common law of the land," and assuring them that the applicable rules of law "need[ed] no Explanation [since] your Good Sence & understanding will Direct ye as to them...."

Schwarzer, *Communicating With Juries: Problems and Remedies,* 69 Cal.L.Rev. 731, 734–35

(1981) (quoting from W. Nelson, *Americanization of the Common Law* 26 (1975)).

**90.** At one time, every American jurisdiction punished libel. *See Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), and statutes collected therein. However, the number of prosecutions for criminal libel has steadily dwindled over the years. For a compilation of criminal libel prosecutions in the first half of this century, *see* Leflar, *The Social Utility of the Criminal Law of Defamation,* 34 Tex.L.Rev. 984 (1956).

**91.** *See* Model Penal Code § 250.7 comments, at 44 (Tent.Draft No. 13, 1961).

**92.** 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

oral argument, however, after the court announced its intention to declare the statute unconstitutional, the plaintiffs withdrew their request for injunctive relief. For this reason, the court declines to grant an injunction.

## V

### CONCLUSION

For the foregoing reasons, the court hereby declares that the South Carolina criminal libel statute, S.C.Code Ann. § 16-7-150 (Law.Co-op.1976), as presently drafted, is overbroad and vague in violation of the First and Fourteenth Amendments to the United States Constitution.

IT IS SO ORDERED.